*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0136P (6th Cir.)
File Name: 04a0136p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellee,*

　　*v.*

NOAH BEVERLY (00-3617);
JOHNNY P. CROCKETT
(00-3618); DOUGLAS A.
TURNS (00-3741),
　　　*Defendants-Appellants.*

Nos. 00-3617/
00-3618/3741

Appeal from the United States District Court
for the Southern District of Ohio at Columbus
No. 99-00104—James L. Graham, Chief District Judge.

Argued: February 4, 2003

Decided and Filed: May 12, 2004

Before: BOGGS, Chief Judge; NORRIS, Circuit Judge;
and BELL, Chief District Judge.[*]

---

[*] The Honorable Robert H. Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

---

---

### COUNSEL

**ARGUED:** Richard A. Cline, MITCHELL, ALLEN, CATALANO & BODA, Columbus, Ohio, Kevin P. Durkin, TAYLOR & DURKIN, Columbus, Ohio, Gary W. Deeds, Columbus, Ohio, for Appellants. J. Michael Marous, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee. **ON BRIEF:** Richard A. Cline, MITCHELL, ALLEN, CATALANO & BODA, Columbus, Ohio, Kevin P. Durkin, TAYLOR & DURKIN, Columbus, Ohio, Gary W. Deeds, Columbus, Ohio, for Appellants. J. Michael Marous, David J. Bosley, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee.

---

### OPINION

---

BOGGS, Chief Judge. Noah Beverly, Douglas A. Turns, and Johnny P. Crockett were indicted for multiple crimes by a federal grand jury, charging them with conspiracy to commit armed bank robbery, in violation of 18 U.S.C. § 371, committing various armed bank robberies, in violation of 18 U.S.C. § 2113(a) and (d), and possessing firearms during and in relation to these crimes of violence, in violation of 18 U.S.C. § 924(c). After two evidentiary hearings, a jury trial commenced in which all three defendants were tried together. On February 8, 2000, the jury returned a verdict of guilty on all counts against Beverly and Turns. Crockett was found guilty of conspiracy to commit armed bank robbery, of robbing Security National Bank, and the Park National Bank in Hebron, Ohio, and of using a firearm in commission of those crimes, but was found not guilty of robbing two other banks with another defendant not involved in this appeal.

All three defendants have appealed this verdict. Beverly appeals the introduction of mitochondrial DNA (mtDNA) evidence against him at trial, arguing that the evidence was not scientifically reliable and, even if reliable, its probative value was outweighed by its prejudicial effect. In addition, Beverly joins the other defendants in bringing a *Batson* challenge, arguing that the district court committed clear error when it granted the government's peremptory challenge against an African-American who could have been seated on the jury panel. Turns appeals the district court's decision to join his trial with the other two defendants, and further argues that the district court abused its discretion in denying his Rule 14 motion to sever his trial. Turns also contends that the district court abused its discretion in limiting his examination of a government witness, that the district court erred in its denial of his motion for acquittal, and that his sentence of seventy-one and one half years, largely mandated by the requirement of consecutive sentencing under 18 U.S.C. § 924(c)(1)(D)(ii), is cruel and unusual punishment in violation of the Eighth Amendment. Crockett appeals his conviction on the basis of prosecutorial misconduct and argues that the district court erred in its denial of his motion for acquittal. In addition, Crockett contends that the district court abused its discretion in failing to excuse a potential juror for cause, in admitting testimony regarding his wife's pretrial identification of him in a bank surveillance photo, in admitting into evidence his failure to file income tax returns, and in limiting his examination of a government witness's probation officer. For the reasons set forth below, we affirm the defendants' convictions.

## I

This case is about a series of bank robberies that occurred in Ohio between September 1994 and November 1995. Much of what happened was described by two men who testified at trial: Anthony Lavelle Rogers and his half-brother Melvin Warren, Jr.. In each of the seven robberies, either Rogers, Warren, or both, participated in the event and so testified to what occurred. Neither Rogers nor Warren are defendants in this case because they both entered into a plea agreement as part of a guilty plea to armed bank robbery.

### *Delaware County Bank and Trust*

According to Rogers's testimony at trial, on September 26, 1994, Rogers and Turns stole a Chevrolet Blazer from a trucking company and robbed the Delaware County Bank and Trust in Ashley, Ohio on the following day. Turns waited outside, feigning mechanical problems, while Rogers, having borrowed Turns's gun, went inside and robbed the bank. Rogers carried a silver pistol provided by Turns. After the robbery, the two drove to Columbus, Ohio where Turns's sister, Starla Turns, had a house. Rogers claimed he gave Turns $5,000 of the more than $70,000 he took from the vault.

Rogers was dating Starla and he was planning on leaving for Disney World with her the next day, so that night Rogers rented a hotel room near the Columbus airport. When Rogers realized that it would unwise to attempt to take the gun on the airplane, he spoke with Turns about what he should do with it. Turns apparently suggested that Rogers leave it underneath the bushes near the hotel, where Turns could later recover it. Turns has a different version. According to the testimony of FBI Agent Harry Trombitas, Turns told him that he, Turns, had found the gun in his car after having lent the vehicle to Rogers. Turns then informed Agent Trombitas about the weapon, and stashed it under some bushes by this same hotel while waiting for the FBI to come and pick it up. In Florida, while visiting Disney World, Rogers and Starla

used various forms of false identification, which were allegedly provided to them by Turns.

Within ten days of the robbery, Lisa Dennis, Turns's girlfriend, made two round-number cash deposits to her bank account. The first deposit, made two days after the robbery, was for $500, and a week later, a second deposit of $600 was made. According to testimony presented at trial, neither Turns nor his girlfriend had a source of income that would explain these deposits. Turns's entire income during this period was apparently derived from unemployment benefits and his girlfriend, Dennis, was only receiving general assistance and funds from Aid to Dependant Children.

Eleven months later, Turns provided details of this robbery to the FBI, but denied his own involvement. Turns placed the amount stolen as between $70,000 and $80,000. The actual amount stolen was $72,500. Turns implicated Rogers, describing his disguise and noting that he had seen Rogers in a white Chevrolet Blazer with Kentucky license plates.

### Park National Bank in Kirkersville, Ohio

In December 1994, Rogers, his half-brother Melvin Warren, and Turns drove Warren's burgundy Cadillac to a Meijer shopping center in Columbus, Ohio, where Rogers stole a car. The theft was recorded by surveillance cameras. Turns, Rogers, and Warren drove to Kirkersville, Ohio. Rogers and Warren then took the stolen car and drove to the bank, while Turns waited with Warren's Cadillac at a nearby freeway on-ramp. Again, Turns feigned mechanical problems while Rogers and Warren robbed the Park National Bank, with Rogers using a gun he had gotten from Turns. Warren used a gun obtained from Beverly. After robbing the bank, Rogers and Warren drove the stolen car to the freeway on-ramp where they shifted into the Cadillac with Turns. Warren,

directed by Turns, drove to Turns's brother's house, where the three counted their take and divided it into thirds.

Several weeks after the robbery, Warren and Rogers were stopped by the police and Rogers used Turns's driver's license as identification. Though Rogers was released, a gun was recovered from the car and Warren was arrested. The ownership of the gun was traced back to Turns, who had purchased the weapon on September 9, 1993. This gun was allegedly provided to Rogers by Turns prior to the Park National Bank robbery.

Eight months after the December 30, 1994 robbery, Turns stated to the FBI that he had been at the aforementioned shopping center with the Meijer store that day with his brother and had happened to see Warren and Rogers there. Turns stated that Warren and Rogers told him details about the robbery later in the day, including the fact that they had taken approximately $35,000. The actual amount stolen was $31,377.

### National City Bank

Another bank robbery occurred five months later, on May 12, 1995, involving Warren, Beverly, and a third man named Colby. Warren testified that while the three of them were drinking at Beverly's house they decided to rob a bank. Warren, Beverly, and Colby parked at a nearby auto-parts store and walked into the National City Bank on Lockbourne Road in Columbus. Once in the bank, they began shouting for everyone to put their hands up. Beverly carried a revolver. The robbery netted $3,428. It was filmed by bank surveillance cameras. Warren identified Beverly as one of the robbers in the surveillance photographs shown at trial.

### Security National Bank

On May 18, 1995, Warren, Rogers, Beverly, and Crockett robbed the Security National Bank in Springfield, Ohio. The four met before the robbery at Beverly's apartment, where they prepared disguises, including masks and bandannas. They then drove together to Springfield in Warren's tan Lincoln Town Car. Once in Springfield, the four drove to a hospital, where Rogers stole a car to use as a getaway vehicle in the robbery. They found an alley behind some buildings across the street from the bank, where they parked the Lincoln. Rogers, Warren, Beverly, and Crockett entered the bank and Crockett, wearing a pair of pantyhose over his head, jumped over the teller's counter and ordered people to the floor. After robbing the bank, the four used the stolen car to get to the alley where the tan Lincoln was parked. They all left their disguises in the stolen car, which was later recovered by the police. The four escaped with $10,538.47.

During the robbery, bank surveillance cameras were working and took several photographs. Both Warren and Rogers were able to identify each other, as well as Beverly and Crockett, in the photos. The government contends that Beverly's pose, disguise, choice of weapon, and use of his left hand is almost identical in the May 18 and the May 12 robbery photos, and that Beverly's revolver, which appears in the pictures, had the same characteristics as the gun recovered after the November 22, 1995 robbery of the Park National Bank in Hebron, Ohio. (*See* page 9, *infra*). The photographs also show a man, identified as Beverly, wearing a "Columbia" hat with holes cut in it as a mask. This hat was later recovered from the abandoned stolen car. It was a hair from this hat that was sent to the lab for the mitochondrial DNA test that was ultimately admitted into evidence at trial.

On July 24, 1995, two months after this robbery, Crockett purchased a 1984 Cadillac for $2,500. Yet, Crockett did not report any income for the year 1995. As part of the bank

robbery investigation, FBI Agent Trombitas interviewed Crockett's wife, who identified her husband in the surveillance photo.

### First National Bank

On July 28, 1995, Rogers, Warren and Turns drove to Zanesville in Turns's BMW. Once in Zanesville, the three drove to a grocery store where Rogers stole a Buick to use as a get-away vehicle. Rogers and Warren took the stolen car to the bank, while Turns drove to a nearby school, their pre-arranged meeting place, and waited. Rogers and Warren entered the bank, both armed. After getting the money, they returned to Turns's car and drove back to Columbus with $41,989. The get-away car was recovered by the police near a school. As it turns out, that same car had been reported stolen from the grocery store where the three had allegedly stopped. In addition, a local resident spotted the BMW near the school during the relevant time period. She identified the make and model, which matched a car that Turns had purchased on May 26, 1995 in Franklin County, Ohio for $5,450.

On the day before the robbery, the balance of the bank accounts of Lisa Dennis, Turns's girlfriend, totaled $24.34. However, her account later showed a deposit made three days after the First National Bank robbery of exactly $1,000. Two days after the First National Bank robbery, Turns and Dennis met with a real-estate agent and put a $5,000 down payment on a house. On August 2, 1995, Turns and Rogers purchased a Porsche in Turns's name with $5,847.23 in cash. Neither Turns nor Dennis filed tax returns in 1994 or 1995.

In the summer of 1995, Turns and his brother went to a gun show with Rogers. They purchased several weapons there.

Rogers testified to the fact it was their collective intention to use these weapons in future robberies.

### Huntington National Bank

Only six days after robbing the First National Bank, on August 3, 1995, Rogers, Turns, and Warren robbed the Huntington National Bank in Marysville, Ohio. Turns drove them to Marysville in his BMW. Contrary to their usual practice, they did not steal a car to use as a get-away vehicle, but instead planned to steal a get-away car at the bank. Once there, Turns dropped the other two off in an alley near the bank and went to a pre-arranged place where they were to meet after the robbery. Rogers and Warren robbed the bank, stole a vehicle, and met Turns at the pre-arranged spot. They abandoned the stolen vehicle and drove back to Columbus with their take of $79,500.

After the Huntington National Bank robbery there were more round-number deposits made to Lisa Dennis's account. Again, Turns described the robbery to the FBI in detail, without mentioning his involvement.

### Park National Bank in Hebron, Ohio

On November 22, 1995, in Hebron, Ohio, Crockett and Warren robbed the Park National Bank. Crockett and Warren both had guns when they entered the bank and both were wearing disguises. Warren identified both himself and Crockett in the bank surveillance video. After finding dye packs in some of the money they had taken, Crockett began throwing the dye packs at the bank employees, who were lying on the floor. Crockett also fired a shot near the tellers. Crockett and Warren stole $30,577 from the Park National Bank. While Crockett was in the car waiting with the door open for Warren to come out of the bank, a car pulled into the bank parking lot. Crockett panicked and pulled away, leaving Warren without a means of escape. When Warren emerged from the bank and realized that Crockett had left, he stole a Cadillac.

The chief of police saw the Cadillac pulling away from the bank and left in pursuit, but he ended up losing Warren in the car chase. Eventually, the stolen Cadillac was recovered. Inside the car, the police found some of the money stolen from the bank and a .22-caliber revolver. The revolver turned out to be the same type of gun used by Beverly in the May 12 and May 18 robberies. The police later recovered a .38-caliber bullet from the gun fired by Crockett at the tellers in the bank.

Rogers and Warren were taken into custody by the FBI in August and December of 1995, respectively, partially as a result of information given to FBI Agent Trombitas by Turns. Rogers and Warren eventually cooperated with the FBI, and ultimately Turns, Beverly, and Crockett were indicted on July 20, 1999 and charged with conspiracy to commit armed bank robbery, committing various armed bank robberies, and for the possession of firearms during and in relation to these crimes of violence.

## II

The three defendants raise many issues, which we will consider in the following order. All three defendants join in the *Batson* challenge, so we will deal with it first in Part III. We then turn to the novel issue of Beverly's challenge to the admissibility of mitochondrial DNA evidence in Part IV. Turns and Crockett each appeal the denial of their separate motions for acquittal, and these issues are dealt with in

Part V. Turns raises three issues peculiar to his trial and sentence, which we deal with in Part VI. Finally, Crockett raises a number of evidentiary issues and a claim of prosecutorial misconduct, which we address in Part VII.

### III

### *Batson Challenge*

Beverly, Crockett, and Turns claim that the prosecutor exercised a peremptory challenge against a potential juror in a racially discriminatory manner, in violation of the Equal Protection Clause. *See Batson v. Kentucky*, 476 U.S. 79 (1986) (prohibiting the exercise of race-based peremptory challenges). In this case, the prosecutor exercised a peremptory challenge to exclude a black woman from the jury venire: Mrs. McKeever. Crockett objected to this challenge, noting that without Mrs. McKeever, there would not be any African-Americans on the jury. The prosecutor stated that he was using a peremptory challenge to remove Mrs. McKeever because she had a brother who had spent time in prison and also had a nephew in jail with whom she still had contact. The district court found that the Government had articulated a legitimate nondiscriminatory reason for the challenge and permitted Mrs. McKeever's removal.

A *Batson* claim is analyzed in three steps. First, the defendant must make a *prima facie* showing that the prosecutor removed a potential juror for a discriminatory reason. If the defendant makes this showing, the second step requires the prosecutor to articulate a nondiscriminatory reason for the removal. Assuming that the prosecutor does so, the third step requires the trial court to determine whether the opponent of the peremptory strike has proven purposeful discrimination. *See, e.g., United States v. Lucas*, 357 F.3d 599, 609 (6th Cir. 2004).

In reviewing the government's race-neutral explanation, we need not find that the reason given is persuasive, or even plausible. *Ibid.* However, the reason cannot be inherently discriminatory. *Ibid.* Furthermore, the district court has the responsibility to assess the prosecutor's credibility under all of the pertinent circumstances, including the final make-up of the jury. We review that determination of fact for clear error. *United States v. Bartholomew*, 310 F.3d 912, 919 (6th Cir. 2002). In this case, the prosecutor gave a plausible and race-neutral explanation for exercising a peremptory challenge against Mrs. McKeever, which the district court accepted. There was no evidence of discriminatory intent inherent in the government's proffered explanation, and a peremptory challenge is not unconstitutional solely because it has a racially disproportionate impact. *Hernandez v. New York*, 500 U.S. 352, 359-60 (1991). Under these circumstances, the district court did not commit clear error in overruling the *Batson* challenge.

### IV

### *Admissibility of Mitochondrial DNA Testing*

Beverly, against whom mitochondrial deoxyribonucleic acid (mtDNA) testing was used in this trial, argues that the district court erred in admitting expert testimony concerning mtDNA evidence. Specifically, Beverly argues that mtDNA testing is not scientifically reliable because the laboratory that did the testing in this case was not certified by an external agency, the procedures used by the laboratory "sometimes yielded results that were contaminated," and the particular tests done in this case were contaminated. In addition, Beverly argues that even if the mtDNA evidence is determined to be sufficiently reliable, its probative value is substantially outweighed by its prejudicial effect. In this part of his argument, Beverly focuses on the statistical analysis

presented, which he claims to have artificially enhanced the probative value of the mtDNA evidence. According to Beverly, Dr. Melton, the government's expert, should only have been allowed to testify that Beverly could not be excluded as the source of the sample in question.

We review the district court's decision to admit expert testimony for an abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S.137,152 (1999); *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 331 (6th Cir. 2001).

Federal Rule of Evidence 702 sets forth the requirements for the admissibility of expert testimony as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The wording of the rule reflects the now-standard inquiry set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which is the basis on which the district court analyzed the expert testimony given in this case. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 n.4 (6th Cir.), *cert. denied*, 534 U.S. 822 (2001). Therefore, we review this case under *Daubert*, which set forth a non-exclusive checklist of factors for trial courts to use in assessing the reliability of scientific expert testimony. These include 1) whether the expert's scientific technique or theory can be, or has been, tested; 2) whether the technique or theory has been subject to peer review and publication; 3) the known or potential rate of error of the technique or theory when applied; 4) the existence

and maintenance of standards and controls; and 5) whether the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 592-95; *Hardyman v. Norfolk & W. Ry.*, 243 F.3d 255, 260 (6th Cir. 2001). If the evidence is deemed to be reliable and relevant, the judge must then determine if the probative value of the evidence is outweighed by its prejudicial effect. *Daubert*, 509 U.S. at 595.

## 1. Mitochondrial DNA Testing in General

Before discussing the particular circumstances of this case, it may be helpful to provide some general background concerning mtDNA analysis. Generally speaking, every cell contains two types of DNA: nuclear DNA, which is found in the nucleus of the cell, and mitochondrial DNA, which is found outside of the nucleus in the mitochondrion. The use of nuclear DNA analysis as a forensic tool has been found to be scientifically reliable by the scientific community for more than a decade. The use of mtDNA analysis is also on the rise, and it has been used extensively for some time in FBI labs, as well as state and private crime labs. *See, e.g.,* Micah A. Luftig & Stephen Richey, *Symposium: Serenity Now or Insanity Later?: The Impact of Post-Conviction DNA Testing on the Criminal Justice System: Panel One: The Power of DNA*, 35 New Eng. L. Rev. 609, 611 (2001). This technique, which generally looks at the differences between people's mitochondrial DNA, has some advantages over nuclear DNA analysis in certain situations. For example, while any given cell contains only one nucleus, there are a vast number of mitochondria. As a result, there is a significantly greater amount of mtDNA in a cell from which a sample can be extracted by a lab technician, as compared to nuclear DNA. Thus, this technique is very useful for minute samples or ancient and degraded samples. *Ibid*. In addition, mitochondrial DNA can be obtained from some sources that nuclear DNA cannot. For example, mtDNA can be found in shafts of hair, which do not have a nucleus, but do have

plenty of mitochondria. Nuclear DNA can only be retrieved from the living root of the hair where the nucleus resides. *United States v. Coleman*, 202 F. Supp. 2d 962, 965 (E.D. Mo. 2002) (accepting expert testimony by Dr. Melton, the expert in this case, and admitting evidence based on mtDNA testing).

On the other hand, mtDNA is not as precise an identifier as nuclear DNA. In the case of nuclear DNA, half is inherited from the mother and half from the father, and each individual, with the exception of identical twins, almost certainly has a unique profile. MtDNA, by contrast, is inherited only from the mother and thus all maternal relatives will share the same mtDNA profile, unless a mutation has occurred. *Ibid.* Because it is not possible to achieve the extremely high level of certainty of identity provided by nuclear DNA, mtDNA typing has been said to be a test of exclusion, rather than one of identification. *Id.* at 966.

The entire mtDNA sequence, about sixteen thousand base pairs, is considerably shorter than nuclear DNA, which has approximately three billion pairs. Within the mtDNA, two noncoding regions are targeted – Hypervariable-1 (HV1) and Hypervariable-2 (HV2). Each of these regions is about 300 letters in code length and is a region that has a mutation rate five to ten times greater than that of nuclear DNA. Usually there is a one to two percent variance of mtDNA sequence between unrelated individuals. *Luftig & Richey*, *supra*, at 612. It has been estimated that mutation within the mtDNA control region is one nucleotide difference every 300 generations. National Commission on the Future of DNA Evidence, *The Future of Forensic DNA Testing: Predictions of the Research and Development Working Group 7*, Nat'l Inst. of Justice (2000). *But see* Ann Gibbons, *Calibrating the Mitochondrial Clock*, 279 Science 28 (1998) (discussing research estimating that mutations occur as frequently as every 40 generations). This academic dispute does not affect this case directly. In general, the slower the mutation rate, the

more people who will have the same mtDNA pattern, and vice-versa. However the figures presented to the jury were from a database of actual DNA patterns collected by forensic scientists. The mechanics of the analysis involves a process similar to that used with nuclear DNA. *Coleman*, 202 F. Supp.2d at 969.

This court has not until now had the opportunity to rule on the admissibility of mtDNA testing. However, mtDNA testing has been admitted into evidence by several state courts and has been upheld on review. *See, e.g., State v. Underwood*, 518 S.E.2d 231 (N.C. Ct. App. 1999); *State v. Scott*, 33 S.W.3d 746 (Tenn. 2000); *State v. Council*, 515 S.E.2d 508 (S.C. 1999); *People v. Klinger*, 713 N.Y.S. 2d 823 (N.Y. Crim. Ct. 2000); *Williams v. Maryland*, 679 A.2d 1106 (Md. 1996).

2. Mitochondrial DNA in this Case

The district court in this case held a very extensive hearing in order to determine the admissibility of mtDNA evidence at trial. The court determined that the techniques had been established and accepted by the scientific community, accepted by the courts, and had been subject to peer review. Beverly now argues that the district court abused its discretion on the basis of three objections.

Beverly argues that Dr. Melton's laboratory, which had analyzed the sample in this case, has never been certified by an external agency. This point was raised in the pretrial hearing, and, although there is no legal requirement that Dr. Melton's lab be so certified, the district court did question Dr. Melton on this point. Laboratories doing DNA forensic work are accredited through the American Society of Crime Laboratory Directors. However, Dr. Melton's lab, having only been actively engaged in case work for about 11 months at the time of the trial, was not yet able to apply for the accreditation, but was expected to go through the process the

following spring. Furthermore, Dr. Melton's own credentials are considerable. Not only has she been working with mtDNA since 1991, she has a Ph.D from Pennsylvania State University in genetics; her thesis investigated mitochondrial DNA as it would apply to forensic applications. In addition, Dr. Melton has published a significant amount of work in this field.

Next, Beverly argues that Dr. Melton's procedures would sometimes yield results that were contaminated, and that furthermore, the sample analyzed in this particular case was contaminated. Testimony given by Dr. Melton and Dr. Kessis, who was Beverly's expert at trial, supported Beverly's general contention, but no evidence demonstrated that any contamination in this case affected the results of the analysis. Dr. Melton testified that "[we] occasionally have what we call sporadic contamination," probably as a result of residue on a piece of equipment brought into the lab. However, Dr. Melton was confident that no contamination of the sample itself had occurred. The reagent blank in the test of the sample itself did not show any indication of contamination, in contrast to a separate reagent blank, used in a different test tube, which was a control in the experiment. Therefore, the actual data relied upon in this case, obtained from the sequencing machine, did not indicate any presence of a contaminant.

Finally, the district court carefully considered during the pretrial hearing the question of whether the relevance of this evidence outweighed its probative value. In particular, Beverly argued that the jury would associate mitochondrial DNA analysis with nuclear DNA analysis and give it the same value, in terms of its ability to "fingerprint" a suspect. The district court, however, decided that this issue was more appropriately dealt with through a vigorous cross-examination, and in fact that was exactly what occurred at trial. Moreover, the court noted the important probative value that this evidence added to the trial. Finally, the court

separately considered the scientific reliability of the statistical analysis offered by the government, concluding that:

> The predictive effect of the statistical analysis is based upon a formula which is apparently recognized in the scientific community and used in a variety of scientific contexts, and it has been used specifically here in the analysis of mitochondrial DNA results. The Court concludes that it's an accepted and reliable estimate of probability, and in this case, it led to results, interpreted results, which substantially increase the probability that the hair sample is the hair of the defendant in this case.

Based on the record compiled in the district court's careful and extensive hearing on this issue, there was no abuse of discretion in admitting the mtDNA testing results. The scientific basis for the use of such DNA is well established. Any issues going to the conduct of the specific tests in question were fully developed and subject to cross examination. There was no error in finding that the testing methods, and Dr. Melton's testing in particular, were sufficiently reliable to be admissible. Finally, the mathematical basis for the evidentiary power of the mtDNA evidence was carefully explained, and was not more prejudicial than probative.

It was made clear to the jury that this type of evidence could not identify individuals with the precision of conventional DNA analysis. Nevertheless, any particular mtDNA pattern is sufficiently rare, especially when there is no contention that the real culprit might have been a matrilineal relative of the defendant, that it certainly meets the standard for probative evidence: "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The statistical evidence at trial showed that, at most, less than 1% of the population would be expected to have this mtDNA

pattern. Even an article critical of mtDNA stated the most frequent pattern applies in no more than 3% of the population. Erica Beecher-Monas, *The Heuristics of Intellectual Due Process: A Primer for Triers of Science*, 75 N.Y.U.L. Rev. 1563, 1655 n.535 (2000). It would be unlikely to find a match between Beverly's hair and the hair of a random individual. The testimony was that, with a high degree of confidence, less than one percent of the population could be expected to have the same pattern as that of the hair recovered from the bank robbery site, and that Beverly did have the same pattern, and thus could not be excluded as the source of the hair. Finding Beverly's mtDNA at the crime scene is essentially equivalent to finding that the last two digits of a license plate of a car owned by defendant matched the last two numbers of a license plate of a getaway car. It would be some evidence — not conclusive, but certainly admissible. We find the same here.

**V**

*Motion for Acquittal*

During the trial, at the close of the government's case and again at the close of all evidence, both Turns and Crockett made a Rule 29(a) motion for acquittal. On both occasions the district court denied their motions, and both defendants now appeal that decision.

The relevant question in assessing a challenge to evidentiary sufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). *See also United States v. Sykes*, 292 F.3d 495, 498-99 (6th Cir. 2002). "Circumstantial evidence alone, if substantial and competent,

may sustain a conviction under this deferential standard of review." *United States v. Adams*, 265 F.3d 420, 423 (6th Cir. 2001) (citations omitted).

1. Crockett

Crockett contends that there is insufficient evidence in the record to establish that he was involved in a conspiracy to commit bank robberies as set forth in Count One of the indictment. To establish a conspiracy, in violation of 18 U.S.C. § 371, the government must prove beyond a reasonable doubt that there was "an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000) (quoting *United States v. Milligan*, 17 F.3d 177, 182 (6th Cir. 1994)). This requirement has been broken down into a four-part test, which requires the government to prove that: "1) the conspiracy described in the indictment was wilfully [sic] formed, and was existing at or about the time alleged; 2) the accused willfully [sic] became a member of the conspiracy; 3) one of the conspirators thereafter knowingly committed at least one overt act charged in the indictment at or about the time and place alleged; and 4) that overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged." *United States v. Kraig*, 99 F.3d 1361, 1368 (6th Cir. 1996). The government need not show a formal written agreement; a simple understanding between the parties will suffice. *United States v. Clayton*, 357 F.3d 560, 573 (6th Cir. 2004). Nor does "every member of a conspiracy [need to be] an active participant in every phase of the conspiracy." *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986) (quoting *United States v. Cuni*, 689 F.2d 1353, 1356 (11th Cir. 1982)). The defendant need only "know of the conspiracy, associate himself with it and knowingly contribute his efforts in its furtherance." *United States v. Barger*, 931 F.2d 359, 369 (6th Cir. 1990) (quoting *United States v. Luxenberg*, 374 F.2d 241, 250 (6th Cir.

1967)). "A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Ibid.* (quoting *United States v. Strong*, 702 F.2d 97 (6th Cir. 1983)).

The government presented a considerable amount of evidence establishing Crockett's active participation in the conspiracy, particularly through the testimony of Rogers and Warren. For example, both Rogers and Warren testified to Crockett's participation in the robbery at the Security National Bank, specifically describing his participation in creating disguises used during the robbery and in conducting the robbery itself. In addition, there was photographic evidence of his presence at the Security National Bank. Warren also testified to Crockett's participation in the robbery of the Park National Bank in Hebron. There also was evidence that Crockett fired his gun during the course of that robbery, as a bullet matched to his gun was recovered from a file cabinet in the bank. A rational trier of fact could have reasonably relied upon any of this evidence to find that Crockett was a willing participant in the conspiracy charged in Count One of the indictment.

2. Turns

Turns argues that the government's evidence was insufficient because "the credibility of Rogers and Warren is suspect to the point that reasonable minds should reject their testimony as a matter of law." Turns's Brief at 24. However, determining the credibility of witnesses is a task for the jury, not this court. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993) (noting that this court does not weigh evidence, make credibility determinations, or substitute its judgment for that of the jury). In reviewing the denial of a motion for acquittal, we must "refrain from independently judging the credibility of witnesses or [the] weight of the evidence." *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002). Moreover, all reasonable inferences are to be

drawn in the government's favor. *United States v. Kelly*, 204 F.3d 652, 656 (6th Cir. 2000). The jury obviously accepted the testimony of Warren and Rogers. Moreover, Turns provided the FBI with a detailed account of the robberies, his gun was found with two of the robbers, he provided false identification to a co-conspirator, and he made several purchases and bank deposits directly after three of the robberies to which he was linked. The evidence against Turns was sufficient for a rational trier of fact to have found Turns guilty.

## VI

### A. Severance of Turns's Trial

Turns contends that the district court should not have joined his trial with Beverly's and Crockett's. Turns argues that the alleged conspiracy between Rogers, Warren, and Turns was entirely separate from the alleged conspiracy that existed between Rogers, Warren, and Crockett that, according to Turns, dominated in this case. We do not find this argument persuasive.

Rule 8(b) of the Federal Rules of Criminal Procedure permits two or more defendants to be charged in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." All of the defendants committed bank robberies with Rogers and Warren during the course of the conspiracy and their testimony was admissible against all of the defendants, including Turns. The robberies were a series of offenses that were conducted over a relatively short period of time and performed using a similar pattern of behavior. The district court, therefore, did not err in joining the trial of Turns with that of Crockett and Beverly.

Turns relies on *United States v. Hatcher*, 680 F.2d 438, 441 (6th Cir. 1982), in which this court held that the joinder of two defendants was improper under Rule 8(b). In *Hatcher*, both defendants, Manetas and Hatcher, were jointly indicted for federal narcotics crimes. Although both defendants had been charged with three counts relating to the possession and distribution of heroin, one of the defendants had also been charged with three counts relating to the possession and distribution of cocaine in an entirely unrelated series of offenses. This court held that since there was "no connection between Manetas and the cocaine-related charges against Hatcher," the joinder of the two defendants was improper. *Ibid.* The court further noted that "[t]he joinder of multiple defendants is proper under Rule 8(b) only if each of the counts of the indictment arises out of the same act or transaction or series of acts or transactions . . . ." *Ibid.*

The case before us now is distinguishable from *Hatcher*, because each bank robbery can easily be viewed as part of one ongoing set of transactions, linked together by Rogers and Warren. Furthermore, we have held that "a group of acts or transactions constitutes a 'series' if they are logically interrelated," and that a "group of acts or transactions is logically interrelated, for instance, if the acts or transactions are part of a common scheme or plan." *See United States v. Johnson*, 763 F.2d 773, 776 (1985) (noting that several other circuits have held similarly and citing *United States v. Corbin*, 734 F.2d 643, 649 (11th Cir. 1984); *United States v. Cavale*, 688 F.2d 1098, 1106 (7th Cir. 1982); *United States v. Ford*, 632 F.2d 1354, 1371-72 (9th Cir. 1980)). Given the common scheme involved in this case, the district court did not abuse its discretion in joining Turns's trial with that of Beverly and Crockett, pursuant to Rule 8(b).

Turns also argues that the district court erred in denying his motion to sever the trial, brought under Rule 14 of the Federal Rules of Criminal Procedure. Severance of a joint trial is permitted, if joinder is prejudicial. Fed. R. Crim. P. 14; *see*

*also United States v. Critton*, 43 F.3d 1089, 1097-98 (6th Cir. 1995) ("Rule 14 allows for severance if it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants.") (internal quotation marks omitted). We review a denial of severance by the district court for a clear abuse of discretion. *United States v. Causey*, 834 F.2d 1277, 1287 (6th Cir. 1987). Furthermore, a strong policy presumption exists in favor of joint trials when charges will be proved by the same evidence and result from the same acts. *See United States v. Hamilton*, 689 F.2d 1262, 1275 (6th Cir. 1982).

Turns argues that his trial was prejudiced by being joined with the other defendants since the credibility of the testimony of Rogers and Warren, the government witnesses who placed Turns at the scene of the crime, was bolstered by additional pieces of incriminating and corroborating evidence in the case against Beverly and Crockett. For example, in Crockett's case, the government presented a photograph taken during one of the bank robberies, which was purported to be of Crockett while he was in the process of robbing the bank. In Beverly's case, there was mtDNA evidence presented that linked Beverly to one of the robberies. These pieces of evidence corroborated the testimony given by Rogers and Crockett, although the evidence would have been inadmissible in a trial focused solely on Turns.

Turns's contention that Rogers's and Warren's testimony was bolstered during the trial by corroborating evidence presented in the case against Beverly and Crockett is unpersuasive. We have stated in *Causey*, 834 F.2d at 1288, that "a defendant is not entitled to severance simply because the evidence against a co-defendant is far more damaging than the evidence against him." Moreover, a defendant does not have a right to a separate trial, merely because his likelihood of acquittal would be greater if severance were granted. *See United States v. Gallo*, 763 F.2d 1504, 1526 (6th Cir. 1985) (citing *United States v. Stirling*, 571 F.2d 708, 733

(2d Cir. 1978); *United States v. Larson*, 526 F.2d 256, 260 (5th Cir. 1976)). "Absent a showing of substantial prejudice, spillover of evidence from one case to another does not require severance." *Ibid.* (citing *United States v. Ricco*, 549 F.2d 264, 270-71 (2d Cir. 1977)). Turns has not made a showing of substantial prejudice in this case, and thus the district court did not abuse its discretion by denying Turns's motion for severance.

### B. The Cross-Examination of Anthony Rogers

Turns contends that the district court abused its discretion by not allowing him to question Rogers on cross-examination about his alleged attempt to sexually molest Turns's twelve-year-old daughter. We review a trial court's rulings on the scope of cross-examination for an abuse of discretion. *United States v. Chance*, 306 F.3d 356, 385 (6th Cir. 2002).

At trial, during his opening statement, Turns's counsel stated that "Mr. Rogers is not a very nice person, that he attempted to molest my client's twelve-year old daughter. She was twelve-years old at the time . . . ." The government objected at this point, arguing that this information was irrelevant and therefore inadmissible. Turns's counsel responded that the information was crucial to Turns's defense and that it was "not being offered for impeachment purposes." Defense counsel went on to explain that this information was relevant to Turns's motivation for going to the FBI and providing information on Rogers and Warren. The district court questioned Turns's counsel further as follows:

**The Court:** Again, what difference does it make what his motive was in going to the FBI?

**Turns's Counsel:** Isn't it always important when the government is trying to prove a case against somebody what somebody's motive is?

**The Court:** What the motive is is the motive for the bank robberies and the conspiracy.

The district court subsequently sustained the objection. Later in the trial, during Turns's cross-examination of Rogers, Turns's counsel again tried to question Rogers about his alleged sexual assault of Turns's daughter. This time, however, Turns's counsel noted that he wished to question Rogers on this point in order to prove bias: to show that the abuse of Turns's daughter related to why Rogers was appearing as a government witness against Turns. The district court again decided that the testimony was inadmissible, stating in relevant part:

I am going to adhere to my original ruling. This would be injecting a matter that's entirely collateral to the issues here, not relevant in any way, and extremely prejudicial to the government. So I am going to adhere to my earlier ruling, and you're not permitted to ask such questions.

Later, when the issue was raised again, defense counsel told the court that he would specifically like to ask Rogers: "Isn't it true that you knew Doug Turns was aware of your sexual misconduct with his daughter, and that's why you falsely accused him of these bank robberies?" Before ruling on whether this question could be asked, the court asked counsel if he had any information indicating that Mr. Rogers was aware of Turns's accusations, to which Turns's counsel responded that he did not. Again, the court ruled that this line of questioning was improper. The jury heard about the allegation when Turns testified himself that Rogers had molested his daughter, which prompted him to turn Rogers in to the FBI. Turns now argues that the district court committed constitutional error in denying Turns the ability to prove bias.

The trial court has broad discretion regarding the scope of cross-examination. *United States v. Mohney*, 949 F.2d 1397, 1409 (6th Cir. 1991). Yet, as pointed out by Turns in his brief, the Supreme Court has noted that the "cross-examination of a witness is a matter of right." *Alford v. United States*, 282 U.S. 687, 691 (1931). Furthermore, the Court has subsequently stated that "[c]ross-examination is the principal means by which the believability of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Davis v. Alaska*, 415 U.S. 308, 316 (1974) (holding that precluding a defendant from cross-examining a key prosecution witness to show bias violated the defendant's constitutional right to confront the witness testifying against him). However, the right to cross-examine is not absolute. *United States v. Atisha*, 804 F.2d 920, 929-30 (6th Cir. 1986). Trial judges have latitude to "impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Blakeney*, 942 F.2d 1001, 1022 (6th Cir. 1991) (emphasis omitted). *See also United States v. Broadus*, 7 F.3d 460, 465 (6th Cir. 1993).

In this case the trial court did not abuse its discretion in ruling that this information was inadmissible, as it was only marginally relevant and highly prejudicial. It was not obviously relevant for purposes of demonstrating bias, because even if Rogers had sexually molested Turns's child, there was no evidence that Rogers had ever been accused of doing so, or knew that anyone suspected him of committing such an offense. Unless Rogers had been confronted, there would be no reason for him to be particularly biased against Turns. The information more accurately explains why Turns would be biased against Rogers, and that is irrelevant to this inquiry. Any evidence of such a heinous act is likely to be prejudicial. Furthermore, any error in the district court's ruling would be harmless, since Turns shared his personal

conviction that Rogers had molested his daughter during his own testimony.

### C.  Turns's Sentence

Turns argues that his sentence of 858 months, or 71 1/2 years, largely mandated by the requirement of consecutive sentencing under 18 U.S.C. § 924(c), is cruel and unusual punishment, in violation of the Eighth Amendment. In particular, Turns argues that his sentence is "grossly disproportionate" to his crime of having driven the getaway car in four bank robberies and provided false identification documents, especially given that he had no prior criminal record and supplied critical information to the FBI about the crimes during its investigation.

Since a constitutional challenge to a sentence raises a question of law, we review Turns's claim *de novo*. *United States v. Flowal*, 163 F.3d 956, 963 (6th Cir. 1998). Turns relies principally on the Supreme Court case of *Enmond v. Florida*, 458 U.S. 782 (1982), in which the Court vacated a *death sentence* that had been imposed on the driver of a getaway car in a double murder. In *Enmond*, the Court reasoned that the sentence did not serve the "two principal purposes" that the death penalty is intended to serve: retribution and deterrence. *Id*. at 798. The Court reasoned that since the defendant "did not kill or attempt to kill" the victims, his "culpability [was] plainly different from that of the robbers who killed," and thus the sentence did not serve the goal of retribution. *Ibid*. Furthermore, the defendant "did not [have] any intention of participating in or facilitating a murder," and "it seems likely that 'capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation.'" *Id*. at 799 (quoting *Fisher v. United States*, 328 U.S. 463, 484 (1946) (Frankfurter, J. dissenting)). Finally, "[u]nless the death penalty when

applied to those in Enmund's position measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." *Id*. at 798 (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977)).

The "narrow proportionality principle," means that only "extreme sentences that are grossly disproportionate to the crime are prohibited." *Flowal*, 163 F.3d at 963-64. A plurality of the Court rejected the defendant's assertion that his life term without parole was disproportionate because it was his first felony conviction. *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991). Instead, the Court observed that the defendant had been convicted of possession of more than 650 grams of cocaine and held that Michigan could determine that the seriousness of the offense warranted the severe sentence. *Id*. at 990.

Here, too, Turns has never been convicted of a felony before. However, he was convicted of participating in four separate armed bank robberies. Even though his role was to drive the getaway car, he was fully aware of the crime he was participating in and thus his culpability is not diminished. Furthermore, at least one of the guns used in the course of the robberies was traced back to Turns, who had purchased it in 1993 and had given it to Rogers. Turns was sentenced to five years for the first of four counts of armed bank robbery brought pursuant to 18 U.S.C. § 2113 (a) and (d) and to twenty years for the remaining three counts, to run consecutively. No one of these sentences is intrinsically "grossly disproportionate" to the crime of armed bank robbery. Mandating consecutive sentences is not an unreasonable method of attempting to deter a criminal, who has already committed several offenses using a firearm, from doing so again. *See Harmelin*, 501 U.S. at 994 (stating that mandatory penalties are not "unusual in the constitutional sense").

This court has addressed a similar claim in an unpublished decision. *United States v. Clark*, 41 Fed. Appx. 745 (6th Cir. 2002). A defendant argued that his thirty-two-year sentence for two convictions under 18 U.S.C. § 924(c) violated the Eighth Amendment's prohibition on cruel and unusual punishment. The panel addressed the merits of the defendant's claim, even though it did not appear that his counsel had raised this issue at the sentencing hearing, which would ordinarily preclude review, stating that it was "satisfied that the Eighth Amendment did not bar [the defendant's] sentence." *Id*. at 751. The court also took note of the fact that in a similar challenge, the Ninth Circuit had held that a defendant's sentence based on his conviction under 18 U.S.C. § 924(c), which accounted for twenty-five years of his total sentence, was not cruel and unusual. *Ibid*. (citing *United States v. Parker*, 241 F.3d 1114, 1117-18 (9th Cir. 2001)).

In this case, although the length of time to be served by Turns, as required by 18 U.S.C. § 924(c), is severe, it would appear to serve the twin goals of retribution and deterrence, without being grossly disproportionate to the several offenses committed. The Supreme Court has never held that a sentence to a specific term of years, even if it might turn out to be more than the reasonable life expectancy of the defendant, constitutes cruel and unusual punishment. *See Harmelin*, 501 U.S. at 996. In the absence of such guidance, we see no principle on which such a result could be based, and we decline to establish such a principle here. *But see Ramirez v. Castro*, No. 02-56066, 2004 WL 868517 (9th Cir. Apr. 19, 2004) (holding 25 years-to-life sentence for three shoplifting convictions, two of which occurred in 1991, violated the Eighth Amendment).

## VII

### *A. Pretrial Identification*

Crockett appeals the district court's decision to admit into evidence the pretrial identification of Crockett by Mrs. Parks, who was his wife when he was arrested, but not when he committed the offense for which he was identified. In addition, Crockett appeals the district court's admission of FBI Agent Trombitas's testimony, as it pertained to the identification made by Mrs. Parks.

Following Crockett's arrest in July 1999, FBI Agent Trombitas went to Crockett's home in order to interview Crockett's wife, Mrs. Parks. Trombitas first informed Mrs. Parks that her husband had been arrested earlier in the day for his involvement in several bank robberies. Agent Trombitas then showed her a photograph that was taken during the bank robbery at the Security National Bank, which occurred on May 18, 1995, approximately two years before Crockett and Mrs. Parks were married, but nevertheless during their acquaintance. Mrs. Parks identified the man that Trombitas pointed to in the photograph as her husband.

The government sought to admit this pretrial identification at trial and Crockett filed a motion to suppress. As a result, Judge Graham held a pretrial hearing on the admissibility of Mrs. Parks's identification. At the pretrial hearing, Trombitas testified as to the circumstances under which the identification was made. Trombitas explained that he took out the photograph, placed it in front of her and asked, "do you recognize that person there?" According to Trombitas, Mrs. Parks picked up the photograph, and with one hand on her mouth, said "oh, my God, that looks like Johnny." At that point, Trombitas noticed her eyes tearing up and asked her to reaffirm the identification, saying: "so that looks like Johnny?" *Ibid.* Mrs. Parks responded "yes, it does, it's him, and I'm not going to lie for him." *Ibid.* At this point, Mrs.

Parks began to cry. Upon Trombitas's request, Mrs. Parks turned over the photograph and placed her name, the date, and Crockett's name on the back of the photograph. Judge Graham ruled that, based upon the totality of the circumstances, the photographic identification procedure was sufficiently reliable to permit the witness to testify.

Later on, at trial, the government represented to the court that the FBI and the postal investigative service had "gone to great lengths" to try to serve Mrs. Parks with no success. As a result, the prosecution sought to introduce this pretrial identification through Agent Trombitas's testimony. Crockett objected on the ground that this was hearsay. However, the court agreed with the government that Mrs. Parks's identification, based on Trombitas's testimony, was admissible as an excited utterance, an exception to the hearsay rule.

Ultimately, after Trombitas had given his testimony, Mrs. Parks testified at the trial. She recanted her identification of Crockett, although she admitted that she had told Agent Trombitas when he interviewed her after Crockett's arrest, that the picture "kind of looked like Johnny."

1. Admission of the Pretrial Identification.

We review the denial of a motion to suppress identification evidence for clear error. *United States v. Hamilton*, 684 F.2d 380, 383 (6th Cir. 1982). The burden rests on Crockett to demonstrate that the pretrial identification procedure was impermissibly suggestive. *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992). If Crockett can demonstrate that the police performed an unduly suggestive photographic lineup, then the trial court must determine, in light of all the circumstances, whether the unfair suggestiveness was conducive to a "very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Hill*, 967 F.2d at 230. The Supreme Court has

listed factors that a court should weigh in determining whether an identification is reliable, even though an unduly suggestive identification procedure may have been used. These factors are: 1) the witness's opportunity to view the criminal at the time of the crime; 2) the witness's degree of attention, 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 198-200 (1972) (stating that the "likelihood of misidentification . . . violates a defendant's right to due process," not a suggestive line-up *per se*).

Before ruling on the admissibility of this evidence, the district court in this case carefully considered the reliability of the identification. The judge noted that there was only one photograph, that the witness did not observe the offense, but was certainly familiar with the suspect, and that the photograph was of "very good quality . . . clearly portray[ing] Crockett's] facial features, as well as all of the other characteristics of his physical anatomy." Although these observations are not necessarily helpful in evaluating all of the *Biggers* factors outlined above, they do properly address the question of reliability, the fundamental inquiry.

This was not a typical police photo spread in which a witness is asked identify an otherwise-unknown perpetrator based solely on observation at the time of the crime. In this instance, Mrs. Parks was being asked whether the bank surveillance picture in fact depicted someone she knew very well and would readily recognize. The *Biggers* factors are not particularly helpful in a case such as this, where the identification has been made by someone close to the suspect. Rather, we should be guided by cases in which identifications have been made by relatives or close friends. *United States v. Saniti*, 604 F.2d 603 (9th Cir. 1979), held that two roommates of the accused could properly be permitted to identify the defendant as the person in a bank surveillance

photo. *See also United States v. Borelli*, 621 F.2d 1092 (10th Cir. 1980) (holding that a trial court did not abuse its discretion by admitting into evidence identification testimony of defendant's stepfather who recognized the defendant in a bank surveillance photo).

In this case, although Mrs. Parks was provided with only a single photograph, it was not presented in a suggestive manner. She was not asked "is this your husband?" The identification was not likely to have produced a misidentification, given Mrs. Parks's familiarity with the defendant at the time when the picture was taken. Furthermore, given her relationship to the defendant, she would be unlikely to be biased against him, and would have every reason not to identify Crockett to the authorities, if there was any doubt. The district court, therefore, did not commit clear error in denying Crockett's motion to suppress this pretrial identification.

2. Excited Utterance.

The district court separately analyzed the question of whether Agent Trombitas would be allowed to testify about the statements made by Mrs. Parks during his interview, in which she identified Crockett as one of the men in the bank surveillance photo. It is undisputed that Trombitas's testimony with regard to Mrs. Parks's identification of Crockett was hearsay; what is disputed is whether the comments were "excited utterances" and therefore within an exception to the hearsay rule. Federal Rule of Evidence 803(2) provides that "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not barred by the hearsay rule. The excited utterance rule requires that 1) there be an event startling enough to cause nervous excitement; 2) the statement be made before there is an opportunity to contrive or misrepresent; and 3) the statement be made while the person in under the stress of the excitement

caused by the event. *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983). *See also United States v. Winters*, 33 F.3d 720, 722-23 (6th Cir. 1994).

The district court found that Mrs. Parks's statements met the three requirements of our excited utterance doctrine. First, viewing the "photograph of the individual that she recognized as her husband committing a bank robbery" was a startling event. Second, according to Trombitas's testimony, Mrs. Parks uttered the words "oh, my God, that looks like Johnny," as soon as she saw the photograph, and therefore before she could have had an opportunity to "contrive or misrepresent." Third, Mrs. Parks identified Crockett in her very first statement upon seeing the photograph, and then with tears in her eyes, reaffirmed that identification, evidence of the fact that she was still under the stress of the moment. The district court did not abuse its discretion in its admission of Trombitas's testimony as it related to Mrs. Parks's pretrial identification.

### B. Admissibility of Crockett's Income Tax Returns

Crockett contends that evidence presented at trial by the government reflecting the fact that he did not file a tax return in 1994 or 1995 was irrelevant and prejudicial. Crockett made a timely objection to the admission of this evidence on these grounds. The court decided to allow the evidence to be presented, albeit with a limiting instruction to the jury, intended to cure any concerns over the potentially prejudicial nature of this information. The instruction given by the court was as follows:

Ladies and gentlemen, let me explain the limited nature of the evidence that you are hearing about this certification of an absence of tax return. None of these defendants is charged with any offense relating to failing

to file tax returns or not reporting income or anything of that nature, and that's not why this is being offered for you. There's no suggestion whatsoever that any of them has done anything improper in regard to their tax returns. This evidence is being offered only for the limited purpose of assisting you in determining what income they may have had during the years in question, and that's the only purpose for which the evidence is being used.

We review the district court's decision regarding the admission of evidence for an abuse of discretion. *United States v. Denton*, 246 F.3d 784, 788 (6th Cir. 2001). "Even if the trial court abuses its discretion, a new trial is not required unless [the] 'substantial rights' of a party are affected." *United States v. Bonds*, 12 F.3d at 540, 554 (6th Cir. 1993) (citing Fed. R. Crim. P. 52(a); *Rye v. Black & Decker Mfg.*, 889 F.2d 100, 103 (6th Cir. 1989)). That is, "an abuse of discretion that does not affect substantial rights is harmless error and is to be disregarded." *Ibid.* (citing Fed. R. Crim P. 52(a)).

Crockett contends that the evidence demonstrating that he did not file tax returns in 1994 and 1995 was irrelevant for two reasons. First, Crockett points out that he was not on trial for any illegal activity in 1994. Second, no evidence was offered by the government to demonstrate that he had spent more money than he could have earned without being required to file an income tax return during the relevant time period. Crockett also argues that whatever potential relevance this evidence had was outweighed by its prejudicial effect, although he does not elaborate further as to how the evidence was prejudicial.

Prior to submitting this information with regard to Crockett's tax returns, the government had introduced evidence that Crockett purchased a 1984 Cadillac automobile for $2,500 on July 24, 1995, approximately six weeks after

the Security National Bank robbery. Crockett's failure to file an income tax return in 1995 can be considered to be relevant: if Crockett's legal income was insufficient to require a return to be filed, it would seem unlikely that someone making such a small income would be able to buy a car for $12,500 in cash. Crockett's failure to file a tax return in 1994, however, is less relevant, although it might be seen as demonstrating that Crockett did not have a large income in 1994 that could have explained purchases made in 1995. In any case, given the district court's clear instructions to the jury and warning that this evidence was not intended to show that the defendant had committed tax fraud, the evidence would not have had a prejudicial impact on Crockett's trial, affecting his substantial rights. The district court, therefore, did not abuse its discretion in admitting evidence demonstrating that Crockett had not filed tax returns in 1994 and 1995.

### C. Crockett's Examination of Rogers's Probation Officer

Crockett contends that the district court erred in imposing limitations on Crockett's examination of Rogers's probation officer. We review a trial court's rulings on the scope of cross-examination for an abuse of discretion. *United States v. Chance*, 306 F.3d 356, 385 (6th Cir. 2002).

During the course of the trial, Crockett asked the district court to approve the issuance of a subpoena for the court's probation officer, Ms. Laura Jensen. The district court approved the issuance of that subpoena, but according to the court's local rules, a judge is required to determine whether, and to what extent, a probation officer should be permitted to testify. S.D. Ohio Crim. R. 32.2(b). The rule further states, in relevant part:

(d) The Court shall authorize a Probation or Pretrial Services Officer to produce records or testify only if 1)

disclosure is expressly authorized by federal law or 2) the Court finds there has been a particularized showing of a compelling need for such disclosure and that the information is necessary to meet the ends of justice.

(e)(1) If the Court finds that a Probation or Pretrial Services Officer shall be authorized to testify or to produce records, the authorization shall be limited to only those matters directly relevant to the demonstrated need. The Court's Order shall identify the records which shall be produced and the subject matter of the testimony which is authorized.

S.D. Ohio Crim R. 32.2(d) - (e)(1). In order to make the necessary determinations pursuant to the rule, the court held a hearing regarding the possible testimony of Ms. Jensen. At the hearing, Turns represented to the court that he wished to question Ms. Jensen for the purpose of attacking Rogers's credibility by showing that Rogers had made statements to Ms. Jensen that contradicted his testimony at trial. The line of questioning related primarily to information found in Rogers's presentencing report, for which Ms. Jensen had interviewed Rogers. However, the district court found that Turns had not laid a proper foundation in Rogers's testimony, except with respect to Rogers's substance abuse, since Turn's attorney had not drawn Rogers's attention to his prior allegedly inconsistent statements in the report. For this ruling, the court relied on Federal Rule of Evidence 613(b), which states in relevant part:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

The district court determined that Crockett's counsel had demonstrated a compelling need for such testimony and reviewed Crockett's cross-examination of Rogers in order to determine whether a proper foundation had been laid. On the basis of that review, the court limited Crockett's examination of the probation officer to matters relating to substance abuse and prohibited Crockett from questioning the probation officer about information relating to Rogers's mental and emotional health.

Crockett now contends that the district court's decision to limit the examination of probation officer Jensen denied him a fair trial. He maintains that the district court could not first rule that there has been a particularized showing of a compelling need for such disclosure, and that the information is necessary to meet the ends of justice, and then limit the presentation of that evidence. Such contradictory rulings would violate the local rule that governed the hearing on Ms. Jensen's trial testimony. However, Federal Rule of Evidence 613(b) states that extrinsic evidence of a prior inconsistent statement by a witness is not admissible if the witness has not had an opportunity to explain the prior inconsistency. Crockett's lawyer failed to mention the pre-sentence report to Rogers in any context other than the latter's denial of any substance abuse. The Federal Rules of Evidence preempt local court rules. Therefore, the judge correctly limited the probation officer's testimony to the one topic that had been linked to Rogers's pre-sentence report.

## D. Challenge for Cause

Crockett urges this court to hold that the district court abused its discretion in failing to excuse a potential juror for cause. Crockett stated a challenge for cause against a juror who had once worked at the London, Ohio Correctional Institution, where Crockett had previously been incarcerated.

Crockett indicated that he recognized the man. The district court questioned the potential juror about whether he recognized anyone in the courtroom, but the man denied recognizing anyone. Based on this response, the court denied the challenge for cause. Later, Crockett excused the same juror with his last peremptory strike.

Whether or not Crockett's challenge for cause was meritorious, the Supreme Court's decision in *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), forecloses Crockett's claim. "[A] defendant's exercise of peremptory challenges . . . is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." *Id*. at 317. *See also United States v. Quinn*, 230 F.3d 862, 865 (6th Cir. 2000). Furthermore, Crockett does not complain about the jurors who actually decided the case and thus has failed to establish that he had an insufficient number of peremptory challenges to remove all of the jurors that he wished. Crockett suggests that it was necessary for the district court to have explicitly determined that Crockett would not have used his final peremptory challenge for a noncurative purpose, yet he does not cite any law in support of this proposition.

## E. Prosecutorial Misconduct

Crockett contends that he is entitled to a new trial because of prosecutorial misconduct. In particular, Crockett points to a great many comments (seventy in total) made by the prosecutor during his closing argument, which Crockett considers to constitute improper vouching for government witnesses, improper testimony, improper commenting on Crockett's failure to take the stand, misrepresentations of evidence, bolstering of witnesses, and improper attacking of Crockett's legal counsel. Although some of the prosecutor's

statements are cause for concern, ultimately it does not appear that the prosecutor's behavior amounts to reversible error.

Although Crockett lists a myriad of allegedly improper statements in his brief, his only objections at trial to the prosecutor's closing argument attacked the following statements:

> And if you listen to the defense counsel, Agent Trombitas has now become a co-conspirator along with Mr. Rogers and Mr. Warren because he gave them information and set them up, things that they could tell. Not only is Agent Trombitas an agent, but he's become a co-conspirator here by giving them information that they can do. . . . Ladies and gentlemen, why Mr. Crockett did what he did, only he can answer.

> And if either one of them [prosecution witnesses] get caught in a lie, they face the possibility of losing their plea agreement and doing the rest of their life in prison.

Therefore, with the exception of these statements, which we review *de novo*, we review Crockett's objections for plain error. *See United States v. Jackson-Randolph*, 282 F.3d 369, 384 (6th Cir. 2002); *United States v. Modena*, 302 F.3d 626, 634 (6th Cir. 2002).

We review allegations of prosecutorial misconduct under a two-step process. First we decide if the statement was improper; if the answer to that question is yes, we must consider whether the statement was "flagrant." *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). To determine if the statements here reaches that level, effectively rendering Crockett's trial fundamentally unfair, this court considers the following factors: 1) whether the remarks tended to mislead the jury or to prejudice the accused; 2) whether the remarks were isolated or extensive; 3) whether the remarks were deliberately or accidentally placed before the jury; and 4) the

overall strength of the evidence against the accused. *United States v. Green*, 305 F.3d 422, 429-30 (6th Cir. 2002); *Francis*, 170 F.3d at 549-50 (citing *United States v. Monus*, 128 F.3d 376, 394 (6th Cir. 1997)). In examining prosecutorial misconduct, it is necessary to view the conduct at issue within the context of the trial as a whole. *See United States v. Young*, 470 U.S. 1, 12 (1985) (holding that it is critical to examine the statements at issue within the context of the entire record); *Francis*, 170 F.3d at 552 (noting that the determination of whether a prosecutor's behavior constitutes prejudicial error must be made in the context of the whole trial). The district court overruled Crockett's objections with respect to the statements that appear above. Crockett objects to the statement "why Mr. Crockett did what he did, only he can answer," as an impermissible comment on his failure to testify. However, when viewed in context, that does not appear to have been the intent of the prosecutor's statement. The sentences around the statement help to put it into perspective:

> We found another interesting concept of the law is if you don't run, you are not guilty. Ladies and gentlemen, why Mr. Crockett did what he did, only he can answer. But he figured probably he didn't get arrested in '95 or '96, so he was okay, that these guys haven't snitched on him.

It appears that the prosecutor was responding to defense counsel's characterization that "the government says this man robbed four banks, he stuck around Columbus for five years, he waited as his buddies . . . made deals, ignored Trombitas's offer and then counted on twelve white folks to set him free." It was completely proper for the prosecutor to counter defense counsel's seemingly plausible theory that Crockett would not have stayed in the area, had he actually been guilty of the robberies.

From the trial transcript, we can infer that Crockett's attorney objected to the comment about Agent Trombitas

because he felt it was an unfair characterization of his argument to the jury. This comment is simply a rhetorical, albeit somewhat florid, argument that the testimony of Agent Trombitas could only be discounted if the jury believed that he was in fact conspiring with the prosecution witnesses by providing them with information that they otherwise only could have known if Crockett had indeed been conspiring with them. This is certainly a possible inference from the defense argument, and there was no impropriety in the prosecutor's rhetorical means of countering it. *See Green*, 305 F.3d at 430 (stating that rhetorical questions are permissible).

The final complaint is somewhat more valid. No evidence had been introduced demonstrating that if Rogers and Warren were shown to be lying that they could spend "the rest of their life in prison." Both had testified that they had a plea agreement, which required them to testify truthfully. The jury could certainly infer that there would be the potential for serious consequences if the witnesses lied, but the prosecutor technically went beyond what had been presented as evidence by stating they would go to prison for life. However, the remark does not meet the standards for reversal set out in *Green.* The remark did not mislead the jury, nor prejudice the accused. It was an isolated, extravagant remark that asserted slightly more than could be supported in the record. Finally, in the case of Crockett, who is the only defendant who objected to this particular remark, the evidence of his guilt was indeed overwhelming, including in particular the damning photograph, as well as the consistent testimony of Rogers and Warren, which the jury accepted with respect to each of the defendants. Considering all of these factors, we cannot say that this prosecutorial conduct constituted reversible error.

We review the remaining sixty-eight comments for plain error. *See Young*, 470 U.S. at 14, 16 (1985) (holding that although the prosecutor had made improper statements

amounting to error, the error was not reversible under plain-error review since "[v]iewed in context, the prosecutor's statements . . . were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice"). None of the remaining comments could be characterized as misconduct that "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir. 1999). This claim is without merit.

## VIII

For the reasons given above, we **AFFIRM** the convictions of Crockett, Beverly, and Turns.