NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0806n.06
Filed: September 27, 2005

Nos. 04-3852, 04-3853, 04-3854, 04-3855, 04-3856, 04-4015

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CHESTER L. SIMONS, BRETT SIMONS, | ) | NORTHERN DISTRICT OF OHIO |
| CHAD BUSH, DONAL BUSH, and | ) | |
| VICKI LOSH, | ) | |
| | ) | OPINION |
| Defendants-Appellants. | ) | |
| | ) | |

**Before: GUY, BATCHELDER, and GILMAN, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** In December of 2002, a 79-count indictment

was filed against Chester Simons, Brett Simons, Chad Bush, Donal Bush, and Vicki Losh. These

5 defendants, along with 21 other individual and corporate defendants, were charged with a number

of offenses related to the operation of an illegal gambling business in northeastern Ohio. A jury

convicted the 5 defendants as charged.

The defendants raise four issues on appeal. Chad Bush argues that he was deprived of the

effective assistance of counsel because his attorney's representation of multiple defendants in the

present case created conflicts of interest. Donal Bush claims that the district court erred in denying

his motion for acquittal on the basis of insufficient evidence. Four of the five defendants assert that

the district court misstated a key provision of Ohio's gambling law when it instructed the jury.

Finally, all five defendants allege that their sentences are unconstitutional in light of the Supreme

Court's recent decision in *United States v. Booker*, 125 S. Ct. 738 (2005), which held that the United States Sentencing Guidelines are no longer mandatory. For the reasons set forth below, we **AFFIRM** the judgment of the district court as to the defendants' convictions, but **VACATE** their sentences and **REMAND** the cases for resentencing in accordance with *Booker*.

## I. BACKGROUND

### A. Factual background

#### 1. *Myers Lake Instant Bingo*

In early 1999, Donal Bush, Carol Megyes, Chester Simons, and Marcia Williams met for lunch and decided to open a gambling business in Canton, Ohio. The four agreed to invest in an instant bingo store, which would operate from a Canton storefront owned by GDC Investments. GDC Investments is a real estate company partially owned by Donal Bush. Although the venture was not associated with a charity at the time, Chad Bush, the son of Donal Bush, recruited the Community AIDS Network (CAN), a tax-exempt organization dedicated to helping AIDS patients. According to the fiscal manager of CAN, Chad Bush told CAN that he would "take 30 percent off the top for overhead and stuff," with the remaining proceeds going to CAN.

The store, which was called Myers Lake Instant Bingo, sold instant bingo tickets to customers six days a week. Megyes managed the store's daily operations, in which CAN took no part. Chester Simons later provided bingo machines for the Myers Lake store, and he collected the proceeds from the machines once a week.

#### 2. *CAN's involvement ends*

The directors of CAN soon became suspicious about whether CAN was receiving all of the net profits from Myers Lake. In addition, CAN's fiscal manager discovered that the instant bingo

store was allowing the customers to take cash advances from credit card machines, contrary to what had been represented to CAN as the store's policy. This caused CAN to terminate its relationship with Myers Lake. CAN continued to act as the charity for two additional gambling businesses run by Chad Bush and Marcia Williams, one located on Cleveland Avenue in Canton and the other on State Road in Cuyahoga Falls. Within a few months, however, CAN ceased to be the designated charity for these stores as well.

### 3. NAICC's involvement

The management of Myers Lake then turned to the North American Indian Cultural Center (NAICC), another tax-exempt organization. In the spring of 1999, Chester Simons had recruited NAICC to become the designated charity for Route 91 Instant Bingo, another gambling store, and had attempted to open a third NAICC instant bingo store in Youngstown.

During the summer of 1999, V. Lanna Samaniego, who became Executive Director of NAICC in June of 1999, discovered that NAICC's name was being used at three instant bingo locations. She also found that checks were being written from a checking account shared by NAICC and Chester Simons for the purchase of gambling machines and for rent at the Myers Lake location. In addition to the Myers Lake rental checks, which were made out to a company owned by Donal Bush, additional checks were made out to East Financial, which is owned by Chad Bush. NAICC terminated its relationship with all of the gambling stores in October of 1999.

### 4. NHF and Instant Win

After using the names of two additional charities—the Firestone Park Athletic Association and Prisma—for short periods of time, the group decided to create its own charity. In December of 1999, Brett Simons, Chad Bush, and Vicki Losh opened a checking account in the name of the

Natural Health Foundation (NHF). (Brett Simons is the son of Chester Simons.) Chad Bush became the president of NHF when it was incorporated in January of 2000, with Brett Simons and Vicki Losh being listed as the other officers. The charitable purpose identified for this organization was to provide vitamins for the indigent ill.

At the same time, Chester Simons established a business to purchase gambling machines and place them in the instant bingo stores. Instant Win, Ltd., which was incorporated by Chester Simons and Vicki Losh in November of 1999, began purchasing gambling machines and hiring employees. The proceeds from the operation of these machines were divided equally between NHF and Instant Win. By August of 2000, NHF and Instant Win had common offices, and Lisa Wagner, who was hired as an NHF employee in August of 2000, worked for both. Instant Win's offices were moved to a different location on the same street after a police raid of a Cuyahoga Falls comedy club revealed that the club was using Instant Win gaming machines.

Chester Simons subsequently established Apollo LLC, an additional for-profit corporation, to purchase and lease gaming machines. Cash from the various gambling locations was deposited in the Apollo LLC bank account. Lisa Wagner, who also worked for Apollo LLC, was told by Chester Simons, Brett Simons, and Vicki Losh to deposit the cash in amounts of $9,000 or less because "more forms would have to be filled out" for larger deposits.

### 5.    *New locations*

After the founding of NHF and Instant Win, the group began actively seeking additional locations. They opened several new stores in Lake County, Ohio. Two of the Lake County locations were purchased from a local investor by NHF. According to the investor, Chester Simons negotiated the sale price of $40,000, and Vicki Losh delivered that amount of cash to him in "a gym bag or a

paper bag [or] . . . something like that." The managers and workers for the new stores were initially told to take their pay directly from the gambling proceeds. They were subsequently paid by check from Instant Win. Each store used gambling machines owned by Instant Win.

### 6. Money laundering

Between May of 2000 and November of 2001, multiple checks were written from the Apollo LLC account to a checking account in the name of Larry Main. (The Larry Main account, which had been opened in October of 1999, had a payable-on-death provision with Donal Bush as the beneficiary.) Each check that came from the proceeds of the NHF gambling operation was in the amount of $4,000 and stated on the memo line that it was a "rent payment." *Id.* According to the government, the checks were generally given directly to Donal Bush rather than to Larry Main. Although the signature on the endorsement line of each check reads "L. Main" or "Larry Main," the handwriting is different from the "Larry Main" signature on the form setting up the account.

Two checks from the Larry Main account, one in the amount of $40,000 and the other in the amount of $20,000, were deposited in the Instant Win account earlier in 2000. The Instant Win account, in turn, was the source of $341,400 in checks used to pay for instant-gambling machines between January 13, 2000 and June 13, 2000. Thus, according to the government, the $4,000 checks paid to the Larry Main account were disguised payments to Donal Bush from the proceeds of the NHF gambling operation.

Donal Bush was also compensated for his role in the gambling scheme with the free use of an automobile. Instant Win and Chester Simons prepaid a $21,305.69 lease for a Cadillac in December of 2001 and gave the car to Donal Bush to drive without charge.

### 7. The investigation

In May of 2000, a law enforcement task force began investigating the proliferation of instant bingo parlors in Akron, Ohio. After conducting surveillance, viewing subpoenaed financial documents, and recording meetings and telephone conversations for almost 18 months, the police procured search warrants for several gambling stores, the offices of NHF and Instant Win, and the homes of Chester and Brett Simons. They found $124,000 in cash at Chester Simons's residence and $49,000 more at the residence of Brett Simons.

Using subpoenaed financial records, the investigators reconstructed the financial histories of NHF, Instant Win, and Apollo LLC. This reconstruction revealed that over $3.7 million had passed through the NHF account during the investigation. Of this amount, 44% was transferred to Instant Win and only 5.69% was used for charitable purposes. NHF paid the salaries of Brett Simons and Vicki Losh, and it rented its office space from two companies owned by Donal Bush. In order to fulfill its alleged charitable purpose of providing vitamins to the indigent ill, NHF bought vitamins from Kellie Bush, the daughter of Donal and the sister of Chad.

## B.    Procedural background

### 1.    The indictment

A 79-count indictment was filed in the United States District Court for the Northern District of Ohio in December of 2002. Chester and Brett Simons, Donal and Chad Bush, and Vicki Losh were among the 26 corporate and individual defendants accused of "conduct[ing], financ[ing and] manag[ing] . . . an illegal gambling business." Specifically, Chester Simons was charged with one count of conducting an illegal gambling business in violation of 18 U.S.C. § 1955, one count of conspiracy to conduct an illegal gambling business in contravention of 18 U.S.C. § 371, seventy-two counts of money laundering as prohibited by 18 U.S.C. § 1956(a)(1)(b)(i), and one count of

conspiracy to launder money in violation of 18 U.S.C. § 1956(H). Chester's son Brett was accused of the same offenses, with the exception of being charged with only two counts of money laundering. Donal Bush was charged with nineteen counts of money laundering and accused of the same gambling and conspiracy offenses as the other defendants. Chad Bush was charged with one count of conducting an illegal gambling business, one count of conspiracy to conduct a gambling business, and one count of conspiracy to engage in money laundering. Finally, Vicki Losh was accused of one count of conducting an illegal gambling business, one count of conspiracy to do the same, two counts of money laundering, and one count of conspiracy to launder money.

### 2.    *Chad Bush's representation*

Chad Bush was represented by Matthew Fortado, who also represented Brett Simons, Vicki Losh, NHF, and Larry Main. Fortado had previously represented Marcia Williams, who cooperated with the investigators and testified for the government in exchange for not being indicted for her role in the conspiracy.

In response to a motion by the government to inquire into the propriety of joint representation pursuant to Federal Rule of Criminal Procedure 44(c), the judge held a hearing in October of 2003 to determine whether the defendants who were represented by Fortado, and another group also represented by a single attorney, had knowingly waived their rights to conflict-free representation. The judge initially expressed skepticism about whether the attorneys could represent all of their clients fairly. He specifically explained the following conflicts of interest that could arise from multiple representation:

> [D]ual representation may prevent counsel from conducting an independent investigation in support of each of your cases. Importantly, the attorney/client privilege may prevent [your attorney] from communicating information gathered from either one of you.

-7-

Another problem arises when the government may offer immunity or offer to recommend a lesser sentence to one defendant for cooperating with the government. And should one of you receive such an offer, your lawyer has to advise [you] whether or not to accept it. If . . . that were to occur . . . it may harm the case of the other defendant represented by the same lawyer.

. . .

In addition, the government may let a defendant who is not as involved as other defendants plead guilty to lesser charges than the other defendants, however, after the guilty plea, the government may require a defendant to testify.

So when a lawyer represents more than one defendant, he may recommend that, for example—and these things can happen—that the first defendant not plead guilty to protect the other defendant.

. . .

At trial, dual representation may affect how your lawyer . . . exercises peremptory challenges or challenges for cause. . . . For example, potential jurors who may be perceived as favorable to one defendant may not be perceived as favorable to another defendant.

After detailing several other potential conflicts, the judge asked each defendant if he or she understood the problems that could arise from multiple representation. Chad Bush was among those who responded in the affirmative.

The district court then engaged in a lengthy colloquy with Fortado and his clients. After Fortado argued that he be allowed to represent multiple defendants, the court finally agreed, but on the condition that Fortado "prepare a written waiver that's very detailed so your clients are informed of all the trappings." Fortado then prepared a two-page waiver in the form of a letter addressed to Chad Bush, Vicki Losh, Brett Simons, NHF, and Larry Main, noting many of the same potential conflicts that the court had discussed, but adding that "[t]here is such a multiplicity of potential conflicts that this letter cannot hope to be comprehensive." The letter was countersigned by all five

-8-

defendants, with Brett Simons signing both on his own behalf and in his capacity as treasurer of NHF.

According to Chad Bush, Chester Simons paid Fortado $10,000 by check and an additional $10,000 in cash after the trial began. Bush alleges that, in consideration for this payment, Fortado "asked questions helpful to Chester Simons when it was his turn to cross-examine witnesses" and "protected Chester Simons during the trial by failing to elicit testimony . . . to show that [Bush] had a strained relationship with . . . Simons[,] to show that it was unlikely that [Bush] was colluding with . . . Simons." In addition, Bush claims that Fortado failed to elicit evidence "that Vicky [sic] Losh was lying to [Bush] to keep him in the dark" about whether the gambling stores were generating a profit.

Bush moved for a new trial after the seven-day deadline for doing so had expired. *See* Fed. R. Crim. P. 33(b)(2). The district court therefore declined to make factual findings about Fortado's alleged conflict of interest:

> [S]ince this motion for a new trial was filed after the seven days had elapsed, according to Rule 33, the Court can only consider what is newly discovered. And none of this testimony can be considered by the Court regarding your claims that he was ineffective because he didn't prepare you before trial, prep you for your testimony, that's not newly discovered.

For that reason, the record contains no factual findings about whether Chad Bush's attorney had a conflict of interest, or whether the alleged conflict of interest prejudiced Bush.

### 3. *Donal Bush's Rule 29 motion*

After the government presented its case against him, Donal Bush and several other defendants moved for a directed verdict of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. But the district court rejected his contention that the government had presented

insufficient evidence regarding his knowledge of NHF's involvement in the illegal gambling operation.

### 4. *Jury instructions*

The district court based its instructions about the gambling offense on Ohio Revised Code § 2915.02(D), and instructed the jury that the law permitted

> [s]chemes of chance operated by a charitable organization, . . . provided that all the money or assets received from the scheme of chance after the deduction only of prizes paid out during the conduct of the scheme of chance are used by, or given, donated, or otherwise transferred to any organization that is described in [the Internal Revenue Code sections defining charitable organizations] . . . .

In further instructions, the district court quoted the following portion of Ohio Revised Code § 2915.02(D): "No person shall receive any commission, wage, salary, reward, tip, donation, gratuity, or other form of compensation, directly or indirectly, for operating or assisting in the operation of any game of chance."

### 5. *The verdict and sentences*

The jury found the Simonses, the Bushes, Losh, and several of their codefendants guilty in January of 2004. Chester Simons was sentenced to 41 months of imprisonment, at the top of his Sentencing Guidelines' range of 33-41 months. Brett Simons was sentenced to 30 months, a sentence at the bottom of his range of 30-47 months, as determined by the Guidelines. Donal Bush received a sentence of 21 months, also at the low end of his Guidelines' range of 21-27 months. Chad Bush was sentenced to 37 months and a fine of $50,000, the 37 months being at the low end of his Guidelines' range of 37-46 months. Finally, Vicki Losh received a sentence of 33 months, near the low end of the 30-47 month range established by the Guidelines for her offenses.

## II.     ANALYSIS

## A.     Standard of review

### 1. Chad Bush's representation

Claims of ineffective assistance of counsel are reviewed de novo because "the analysis of such a claim requires a consideration of mixed questions of law and fact." *United States v. Jackson*, 181 F.3d 740, 744 (6th Cir. 1999). We review "[a]ny findings of fact pertinent to the ineffective assistance of counsel inquiry . . . [under] a 'clearly erroneous' standard of review." *Id.*

### 2. Donal Bush's Rule 29 motion

A motion for a directed verdict of acquittal based on the alleged insufficiency of the evidence cannot succeed if, "after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" *United States v. Beverly*, 369 F.3d 516, 531 (6th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In reviewing the denial of such a motion, "we must refrain from independently judging the credibility of witnesses or the weight of the evidence . . . [and must draw] all reasonable inferences . . . in the government's favor." *Beverly*, 369 F.3d at 532-33 (citation and quotation marks omitted).

### 3. Jury instructions

Jury instructions are "review[ed] . . . de novo for their accuracy in stating the law." *United States v. Maliszewski*, 161 F.3d 992, 1014 (6th Cir. 1998). "This Court reviews jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *United States v. Hargrove*, 416 F.3d 486, 489 (6th Cir. 2005) (citation, alteration, and quotation marks omitted).

### 4. Sentencing issues

We "review[] a district court's interpretation of the Sentencing Guidelines de novo." *United States v. Jackson*, 401 F.3d 747, 748 (6th Cir. 2005); *see also United States v. Barnett*, 398 F.3d 516, 529 (6th Cir. 2005) (establishing a rebuttable presumption that a pre-*Booker* sentence is prejudicial and requires the case to be remanded for resentencing).

**B.      Chad Bush's representation**

Chad Bush argues that he did not receive the effective assistance of counsel because his attorney faced a conflict of interest stemming from the representation of multiple defendants in the same case. A successful claim of ineffective assistance of counsel, however, requires a finding of prejudice. *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Because "appellate courts are not equipped to resolve factual issues," *id.*, such a finding of fact must generally be made by the district court. *See Massaro v. United States*, 538 U.S. 500, 505 (2003) (adopting a rule favoring the use of collateral proceedings to adjudicate claims of ineffective assistance of counsel and noting that, under that rule, "ineffective-assistance claims ordinarily will be litigated in the first instance in the district court, the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial"); *see also United States v. Goodlett*, 3 F.3d 976, 980 (6th Cir. 1993) (observing that "[g]enerally, this court will not review an ineffective assistance of counsel claim raised for the first time on direct appeal because the record has not been sufficiently developed for assessing the merits of the allegation").

The hearing about Fortado's representation of multiple defendants included a colloquy between the district court and the various defendants about the potential drawbacks of multiple representation. For obvious reasons, however, Fortado did not reveal his trial strategy. Because

Bush's motion for a new trial was filed after the seven-day deadline had expired, the district court was restricted to considering "newly discovered evidence," Fed. R. Crim. P. 33(b)(1), rather than conducting an inquiry into Bush's ineffective-assistance claim. For that reason, the record contains no findings of fact about the content of, and possible justifications for, Fortado's trial strategy. The record is also silent about the extent to which the alleged conflict of interest prejudiced Bush. Because "appellate courts are not equipped to resolve factual issues," *Aguwa*, 123 F.3d at 423, Bush's ineffective-assistance-of-counsel claim cannot be resolved on direct appeal. We therefore decline to rule on the issue at this time, without prejudice to Bush's ability to have the claim adjudicated on collateral review.

**C.    Donal Bush's Rule 29 motion**

Donal Bush claims that the district court erred by failing to grant his Rule 29 motion for acquittal because "[t]he evidence introduced against Appellant concerning his knowledge of the alleged illegality of the gambling business alleged [sic] did not permit a reasonable man to conclude that the Appellant was guilty beyond a reasonable doubt." *Cf. United States v. Beverly*, 369 F.3d 516, 531 (6th Cir. 2004) (holding that the district court's denial of a motion to acquit must be affirmed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (emphasis in original) (citation and quotation marks omitted).

Contrary to Donal Bush's argument, we conclude that the evidence presented by the government easily permitted a rational trier of fact to find that Bush knowingly participated in a gambling business that was being operated for profit. Bush, according to Marcia Williams, was involved in the planning of the Myers Lake location from the very beginning, having attended the

initial meeting with Williams, Chester Simons, and Carol Megyes. She further testified that Bush lent her the money to help establish the Myers Lake store:

> Q: All right. Did Donal Bush put money into [the Myers Lake location]?
> A: No.
> Q: Where did you get the ten thousand?
> A: I borrowed from Donal Bush, and in turn paid him back.

The property that the group examined immediately after the meeting, and selected as the location of their first bingo store, belonged to GDC Investments, which was partially owned by Bush. Likewise, Bush was the lessee for the Clifton Road location storefront. The overwhelming evidence therefore supports the government's contention that Bush knowingly participated in a gambling business.

Bush's knowledge that the business was operating in violation of Ohio's requirement that "[n]o person shall receive any commission, wage, salary, reward, tip, donation, gratuity, or other form of compensation, directly or indirectly, for operating or assisting in the operation of any game of chance," Ohio Rev. Code § 2915.02(D), was equally well-established. In particular, Bush actively recruited employees for at least one location. Helen Lockhart, the manager of the Route 303 location in Brunswick, testified that Bush recruited her in 1999 when she was "looking for employment." Lockhart "took the money for the amount of hours" she worked between 9:00 a.m. and 6:00 p.m. six days per week.

In addition to the evidence of Bush's recruitment of paid employees for a gambling business that was being operated for profit, the government presented evidence that Bush received indirect profits from the business and tried to launder the money. The series of $4,000 checks deposited into Larry Main's checking account shows that Bush was in effect receiving profits from the gambling operation. Indeed, the fact that the payments were concealed through the use of Larry Main's

-14-

account suggests that Bush not only knew that the gambling business was operating for profit, but also knew that this type of business was illegal. Instant Win's prepayment of the Cadillac lease for Bush in December of 2001 further supports the government's contention that Bush knowingly received profits from the gambling operation.

Drawing "all reasonable inferences . . . in the government's favor," *Beverly*, 369 F.3d at 532-33 (citation and quotation marks omitted), the evidence presented at trial was more than sufficient to permit a rational trier of fact to find beyond a reasonable doubt that Donal Bush knowingly participated in an illegal gambling business. We therefore conclude that the district court did not err in rejecting Bush's Rule 29 motion.

**D.     Jury instructions**

Every defendant other than Chad Bush contends that the district court incorrectly interpreted Ohio law when it quoted as follows from Ohio Revised Code § 2915.02(D) in its jury instructions: "No person shall receive any commission, wage, salary, reward, tip, donation, gratuity, or other form of compensation, directly or indirectly, for operating or assisting in the operation of any game of chance." The statute under which the defendants were convicted of operating an illegal gambling business incorporates state law in its definition of an "illegal gambling business." *See* 18 U.S.C. § 1955(b)(1)(i) (defining an "illegal gambling business" as "a gambling business which . . . is a violation of the law of a State or political subdivision in which it is conducted"). For this reason, the legality of the gambling business at issue here turns on the meaning of Ohio Revised Code § 2915.02(D).

This subsection is divided into three numbered parts, the first of which permits "games of chance [other than] . . . craps for money or roulette for money" conducted by, and for the benefit of,

-15-

tax-exempt organizations. Ohio Rev. Code § 2915.02(D)(1). The second numbered part permits "tag fishing tournament[s]" operated under a state-issued permit, and the third allows bingo conducted by charitable organizations holding state licenses. Ohio Rev. Code § 2915.02(D)(2)-(3). As noted by the defendants, however, the anti-compensation provision is the final paragraph of § 2915.02(D) and does not appear under its own numbered subheading. This unnumbered provision also uses the term "game of chance" rather than the term "scheme of chance," the general phrase used elsewhere in the statute to describe gambling operations. *See, e.g.*, § 2915.02(A)(2) (prohibiting "conduct that facilitates any game of chance conducted for profit or any scheme of chance"); § 2915.01(D) (defining "[g]ame of chance" as "poker, craps, roulette, or other game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely by chance, but . . . not . . . bingo." Because bingo is explicitly excluded, the defendants argue that the anti-compensation provision does not apply to their activities.

This argument is unpersuasive for two reasons. First, the Ohio Supreme Court explicitly addressed the applicability of the anti-compensation provision to schemes of chance in *Freedom Road Foundation v. Ohio Department of Liquor Control*, 685 N.E.2d 522, 525-26 (Ohio 1997). Although the court determined that "increased patronage" is not one of the types of compensation prohibited, it explicitly noted that the statute applied to schemes of chance: "[Ohio Rev. Code §] 2915.02(D) permits participation in the operation of a charitable organization's scheme of chance . . . by premises owners and/or their employees, so long as neither owners nor employees are compensated for their participation." *Id*. at 526.

The second defect in the defendants' argument is that the defendants in fact operated "games of chance" as defined by the statute. Section 2915.01(D) states that bingo is not a game of chance,

-16-

but it does not exempt any "other game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely by chance." The Treasure Quest gambling machines used by Instant Win in multiple locations fit the definition of a game of chance because they were designed to accept money in exchange for a chance of winning more money.

Furthermore, even if the district court's instructions implied an erroneous definition of "games of chance," the error was harmless in light of the overwhelming evidence that the vast majority of the proceeds from the gambling businesses were not delivered to a charitable organization. Indeed, only 5.69% of the $3.7 million that passed through NHF's account during the time that the gambling businesses were being investigated was used for charitable purposes. We therefore conclude that the district court did not commit reversible error in its instructions to the jury.

## E.     *Booker* issue

The defendants' final argument—that their sentences are unconstitutional in light of the Supreme Court's recent determination that the Sentencing Guidelines are no longer mandatory—is more persuasive. *See United States v. Booker*, 125 S. Ct. 738, 769 (2005) (holding that the Sixth Amendment bars mandatory sentence enhancements based on judicial factfinding); *United States v. Barnett*, 398 F.3d 516, 529 (6th Cir. 2005) ("Instead of speculating as to the district court's intentions in the pre-*Booker* world, and trying to apply those intentions to predict the same court's sentence under the post-*Booker* scheme, we are convinced that the most prudent course of action in this case is to presume prejudice given the distinct possibility that the district court would have imposed a lower sentence under the new post-*Booker* framework and [given] the onerous burden he would face in attempting to establish that the sentencing court would have imposed such a sentence.").

### 1.     *Donal Bush, Chad Bush, Vicki Losh, and Brett Simons*

As this court noted in *United States v. Oliver*, 397 F.3d 369 (6th Cir. 2005), "even if we conclude that the evidence [upon which the judge based his sentencing determination] is overwhelming and essentially uncontroverted[,] we cannot know the length of imprisonment that the district court judge would have imposed pursuant to this evidence following *Booker*." *Id*. at 380 n.3 (citation and quotation marks omitted). In the present case, Donal Bush, Chad Bush, and Brett Simons all received sentences at the bottom of the Guidelines' ranges for their offenses. Vicki Losh received a sentence near the low end of her Guidelines' range. The government presented no evidence to rebut the presumption that these four defendants were prejudiced by their sentences. *See Barnett*, 398 F.3d at 529. We therefore conclude that their cases must be remanded for resentencing in accordance with *Booker*.

### 2. *Chester Simons*

Chester Simons, on the other hand, was sentenced to 41 months, at the highest end of the Guidelines' range for his offense and criminal history category. A legitimate question can thus be asked if this distinguishes his situation from the others. But this court's one holding that a defendant who had received the maximum sentence under the Guidelines' range applicable to him did not have a cognizable *Booker* claim has been vacated as inconsistent with *Oliver*. *See United States v. Bruce*, 396 F.3d 697, 720 (6th Cir. 2005), *vacated in part*, 405 F.3d 1034 (6th Cir. 2005).

Since *Bruce* was vacated, this court has remanded for resentencing at least one case where a defendant was sentenced at or beyond the top of the applicable Guidelines' range. *See United States v. Meeker*, 411 F.3d 736, 747-48 (6th Cir. 2005) (remanding where the district court departed upward from the top of the Guidelines' range). In addition, the government concedes that "[i]f *Oliver* is controlling, the matter must be remanded for resentencing." We agree where, as here, the district

court did not impose an alternative sentence in anticipation of the Guidelines being advisory only. *Cf. United States v. Chandler*, 419 F.3d 484, 486 (6th Cir. 2005) ("In interpreting *Booker*, this court has held that when a district court sentences a defendant under the presumption that the Guidelines are mandatory, we presume that the defendant's substantial rights were affected. In this case, however, the district court not only determined the Defendant's sentence pursuant to the Guidelines, but also treated the Guidelines as advisory and sentenced the Defendant pursuant to the sentencing factors outlined in 18 U.S.C. § 3553(a). Thus, the imposition of the Defendant's sentence does not implicate the Sixth Amendment.") (citations omitted).

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court as to the defendants' convictions, but **VACATE** their sentences and **REMAND** for resentencing in accordance with *Booker*.