NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0262n.06

Filed: April 7, 2009

## No. 07-6494

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DAWN MAGGARD and DARRELL MAGGARD, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | MEMORANDUM OPINION |
| FORD MOTOR COMPANY, | ) ) | |
| Defendant-Appellant. | ) ) | |

Before: SILER and McKEAGUE, Circuit Judges; LUDINGTON, District Judge.[*]

**McKEAGUE, Circuit Judge**. Ford Motor Company ("Ford") appeals a jury verdict in favor of

Dawn and Darrell Maggard. The jury found Ford strictly liable for injuries sustained by Dawn

Maggard ("Dawn") after her leg was trapped under her Ford Windstar van as it unexpectedly began

to roll backwards out of her driveway. The jury awarded $3,400,000.00 in compensatory damages[1]

and $9,000,003.00 in punitive damages.

---

[*]The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]The district court reduced the amount of compensatory damages to $2,720,000.00 in light of the jury's finding that Dawn was twenty percent at fault.

Ford advances three issues on appeal. First, Ford argues that the district court erroneously excluded statements by Dawn's then ten-year old daughter, Holly Maggard ("Holly"), regarding the events leading to Dawn's injury. Second, Ford asserts that the award of punitive damages was unwarranted under Tennessee law because the Maggards did not demonstrate by clear and convincing evidence that Ford acted recklessly. Third, Ford argues that the award of punitive damages violates Ford's due process rights. For the reasons set forth below, we reverse the district court's exclusion of Holly's statements, vacate the jury's verdict and award of damages, and remand the case for a new trial.

**I**

This case arises from events that occurred on the evening of May 24, 2004. Dawn and her two daughters, Holly and Audrey, were preparing to travel from their home to a local store. They left their house and went to the Maggards' Ford Windstar van. What happened after they approached the Windstar is disputed by the parties; however, both parties agree that the Windstar began rolling backwards. As the Windstar began rolling, Dawn's leg was trapped underneath one of the Windstar's tires. Holly and Audrey screamed as they watched the Windstar pull Dawn with it as it rolled down the driveway and came to a stop in the ditch across from the Maggards' house. Officer James Capps later stated that the accident left "evidence of blood and skin . . . on the driveway and the roadway."

Once the Windstar stopped, Holly and Audrey ran toward Dawn. Holly tried to lift the Windstar off Dawn. Holly then climbed over Dawn, entered the Windstar, placed the gearshift into park, and took the keys out of the ignition. She ran into her home and called 911 on two phones. She put down the phones before the 911 operator answered , leaving the lines open, so that she could

rush back to check on her mother. After neighbors came to the scene of the accident, Holly ran to a neighbor's house, where she and Audrey stayed that night. Emergency personnel responded after Holly had left, and they administered medical care to Dawn. Despite their efforts, Dawn's leg was later amputated.

How the Ford Windstar began rolling down the driveway, trapping Dawn's leg and causing Dawn's injury, is the issue at the center of this lawsuit. There are two competing accounts: one offered by Dawn during her testimony at trial and by Holly during her deposition, the other offered by Holly shortly after the accident in response to questions from a police officer.

According to Dawn's testimony and Holly's deposition, the accident occurred as follows. The Windstar was parked in the driveway of the Maggards' home. Dawn, Holly, and Audrey left their house to get into the Windstar. Dawn entered the Windstar, started the ignition, and backed up the Windstar a few feet to allow her daughters space to walk around to the other side of the Windstar. After backing the Windstar up a short distance, Dawn realized that she needed to return to the house to place the family dog into a kennel. She moved the Windstar's gearshift lever into the park position, left the engine on, and removed her foot from the brake pedal. She exited the Windstar, and it remained stationary. As Dawn walked toward the house, Holly yelled that the Windstar was moving backward down the sloped driveway. Dawn ran to the driver's side door and attempted to enter the Windstar. Unable to stop the Windstar and concerned that it might hit Audrey, Dawn attempted to steer the Windstar away from Audrey. As she did that, the Windstar continued to move backwards down the driveway, trapping Dawn's leg under one of its wheels. Dawn offered

this account throughout the litigation, and Holly provided a substantively identical account at her deposition.[2]

The alternate explanation of the accident arose from statements Holly made to the police just after the accident. Officer James Capps responded to the emergency call and arrived at the scene to investigate the accident. When he arrived, Dawn had already been taken away in an ambulance. Officer Capps examined the scene and questioned those present about the accident. After learning that Holly and Audrey were nearby at a neighbor's house, Officer Capps went to see them. He interviewed Holly approximately thirty to forty minutes after she left the scene of the accident. His report provided as follows:

> [T]he witness, the driver's ten-year-old daughter . . . stated her mother was going to drive her and her little sister to Walgreens. Witness stated her mother was getting in the driver's seat while she and her sister walked around to the passenger side. Witness stated her mother was halfway in the van when she slipped. Witness stated her mother grabbed the gearshift [sic] as she slipped and the van went into reverse. The van was parked at the top of driver's inclined driveway and began rolling backwards. Witness stated her mother could not keep up to get in and, as she struggled, the van turned and the driver's leg was pulled under the front and dragged . . . and victim fell out of the van and was trapped under the van as it came to rest in the ditch across the street.

According to Officer Capps's report, Dawn was wearing flip-flops or sandals that became lodged inside of the vehicle while she was entering the Windstar.

At his deposition, Officer Capps provided the following description of Holly's demeanor at the time that she spoke with him: "I don't recall her being very upset and having difficulty talking

---

[2]At her deposition, Holly stated that her mother started the Windstar and then went to the house to put the dog in the kennel. Holly further stated that she had yelled to her mother that the Windstar was rolling backward and that her mother had run back to the Windstar and had tried to jump in and turn the Windstar away from Audrey. Holly acknowledged, however, that she provided a different account of the accident to Officer Capps, though she could not remember what it was. At trial, Holly stated that she could not see anything that happened as her mother entered the van.

-4-

to me, I mean, other than naturally being upset about what had just happened. And I do kind of recall thinking that she probably didn't really know at the time the seriousness of it."

On May 9, 2005, the Maggards filed a complaint advancing, inter alia, negligence and strict liability claims against Ford. The complaint also identified the Maggards' minor children, Holly and Audrey, as plaintiffs. The Maggards alleged that the accident occurred because the transmission would occasionally rest on the "land" between reverse and park. The Maggards referred to this as "illusory park." They contended that illusory park would lead the driver to believe that the gearshift lever was in the park position, though the gearshift lever could still slip into the reverse position, engaging the transmission and allowing the Windstar to roll backwards.

On December 15, 2006, the Maggards filed twelve motions in limine, including a motion to exclude Holly's statements made to the investigating officer. On December 21, 2006, presumably recognizing that Holly's statements to the police would be admissible as an admission by a party-opponent under FED. R. EVID. 801(d)(2), the Maggards requested that Holly and Audrey be voluntarily dismissed as plaintiffs pursuant to FED. R. CIV. P. 41(a). The district court dismissed Holly and Audrey on January 2, 2007. At the final pretrial conference, the district court granted the Maggards' motion in limine and excluded Holly's statements, concluding that the statements were no longer admissible as an admission by a party-opponent under FED. R. EVID. 801(d)(2). The district court also ruled that Holly's statements were not admissible under the excited utterance exception, FED. R. EVID. 803(2), or present sense impression exception, FED. R. EVID. 803(1). The district court stated that Ford could ask Holly about the statements, but that Ford could not call Officer Capps to testify regarding the statements.

In the joint pretrial order, Ford advanced the theory that "[Dawn] was injured because she got out of the Windstar, leaving its engine running, and without putting it in Park, without removing the key from the ignition or without setting the parking brake, any one of which alone would have prevented this accident from occurring."[3]  Ford's expert witnesses, Frederick W. King, III and Hugh J. Mauldin, Jr. found flaws in both Dawn's account and in Holly's statements to Officer Capps. They did both note, however, that the gearshift could be moved into reverse if someone slipped entering the Windstar, so long as the engine was off and the ignition was in "Off" rather than "Lock."[4]  The district court excluded this testimony because there was no evidence in the record that the engine was off.

A jury trial commenced on July 17, 2007.  Prior to the jury's verdict, Ford moved for judgment as a matter of law.  Ford articulated a number of errors, including the district court's exclusion of Holly's statements.  Subsequently, the jury returned a verdict finding the Windstar to be defective and Ford strictly liable for the Maggards' injuries.  The district court issued a post-trial memorandum and order denying Ford's motion for judgment as a matter of law.  Ford filed a notice of appeal on December 12, 2007.

**II**

---

[3]Subsequent to the jury's verdict, Ford moved to amend the joint pretrial order pursuant to Federal Rule of Civil Procedure 16(e) by omitting the phrase "leaving its engine running, and without putting it in Park."  The district court denied the motion.

[4]The dissent notes that one of Ford's experts suggested that Holly's statements to Officer Capps were "not consistent with the operational characteristics of a 1999 Ford Windstar van."  The dissent fails to note, however, that the expert continued on to note that the description of the accident in Holly's statements to Officer Capps were consistent with the operational characteristics of a Ford Windstar if the engine was off at the time of the accident.

"[E]videntiary decisions such as exclusion of hearsay" are generally reviewed under the abuse of discretion standard. *United States v. Hadley*, 431 F.3d 484, 496 (6th Cir. 2005) (citing *United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 1999)); *see also Schweitzer v. Teamster Local 100*, 413 F.3d 533, 538 (6th Cir. 2005). "An abuse of discretion will be found upon a 'definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'" *Schreane*, 331 F.3d at 564 (quoting *Super Sulky, Inc. v. United States Trotting Ass'n*, 174 F.3d 733, 740 (6th Cir. 1999)).

The district court excluded Holly's statements because it found that the statements were hearsay and that they did not fall within either the excited utterance or present sense impression exception to the hearsay rule. Ford contends that the district court conflated the exception for excited utterances with that of the exception for present sense impressions and that the statements were admissible as excited utterances. We find that the district court did not conflate the two exceptions. The factors for analyzing whether a statement is within the present sense impression exception and whether it is within the excited utterance exception are similar, and the district court appropriately considered both exceptions in assessing Holly's statements.

We also agree with the district court that Holly's statements did not fall under the present sense impression exception. Our analysis therefore turns on whether the district court abused its discretion in finding Holly's statements were not excited utterances. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." FED. R. EVID. 803(2). An excited utterance is considered trustworthy because "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication."

-7-

FED. R. EVID. 803 advisory committee's notes (citation omitted). A hearsay statement is admissible under the excited utterance exception if "(1) there [is] an event startling enough to cause nervous excitement; (2) the statement [is] made before there is an opportunity to contrive or misrepresent; and (3) the statement [is] made while the person [is] under the stress of the excitement caused by the event." *United States v. Beverly*, 369 F.3d 516, 539-40 (6th Cir. 2004) (citing *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983)).

Courts consider these elements on "a case-by-case basis." *Haggins*, 715 F.2d at 1057. "All three inquiries bear on 'the ultimate question': 'Whether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event.'" *United States v. Arnold*, 486 F.3d 177, 184 (6th Cir. 2007) (quoting *Haggins*, 715 F.2d at 1058). Put another way, the exception requires that "the speaker be 'under the sway of' a 'startling event' and that the statement be made before there is an opportunity 'to contrive or misrepresent.'" *United States v. Winters*, 33 F.3d 720, 723 (6th Cir. 1994) (quoting *Haggins*, 715 F.2d at 1057). "The assumption underlying [the] exception is that a person under the sway of excitement precipitated by an external startling event will be bereft of the reflective capacity essential for fabrication and that, consequently, any utterance he makes will be spontaneous and trustworthy." *Haggins*, 715 F.2d at 1057.

There is no dispute regarding the first element in the excited utterance analysis. Holly witnessed a serious accident that caused her mother significant harm. The last image she had of her mother before she left was her mother trapped under the family van in a ditch across the road from their home. It is abundantly clear from the record that the accident was sufficiently startling to cause

nervous excitement, particularly in a 10-year-old girl involved in an accident with her mother, and therefore satisfied the first element. *See Beverly*, 369 F.3d at 539-40.

The district court did not appear to give serious consideration to the second element. The district court simply noted that thirty or forty minutes had passed between the accident and Holly's statements, without addressing whether the passage of time did or did not give Holly the opportunity to fabricate or misrepresent. The period between the startling event and the statement is relevant to determining whether the statement was made before an opportunity to contrive or misrepresent arose.[5] *See Arnold*, 486 F.3d at 185. The excited utterance exception, however, does not contain an explicit time limitation. *Compare* FED. R. EVID. 803(1) *and* 803(2). Indeed, the opportunity to fabricate or misrepresent cannot be reduced to the simple passage of time. We have held that the excited utterance exception permits the admission of a statement made hours after the startling event. *See, e.g.*, *United States v. Baggett*, 251 F.3d 1087, 1090 n.1 (6th Cir. 2001) (finding statements made several hours after startling event were excited utterances); *see also United States v. McCullough*, 150 F. App'x 507, 510 (6th Cir. 2005) (applying exception to statement made approximately two-and-a-half hours after startling event); *United States v. Green*, 125 F. App'x 659, 662 (6th Cir. 2005) (finding statement made three hours after startling event to be admissible as excited utterance in spousal assault because "trauma and anxiety . . . do not suddenly dissipate when the assailant leaves the scene"); *United States v. Tabaja*, 91 F. App'x 405, 410 (6th Cir. 2004) (holding that a statement made up to eleven hours after the startling event was an excited utterance). A court should therefore focus on whether the declarant had the opportunity to fabricate or misrepresent in light of

---

[5]As will be discussed below, the time between the startling event and the statement can also affect the assessment of whether the declarant was still under the stress of the excitement of the event.

the circumstances of the event. *See* FED. R. EVID. 803(2) advisory committee's note ("[T]he character of the transaction or event will largely determine the significance of the time factor.") (quoting M.C. Slough, *Spontaneous Statements and State of Mind*, 46 IOWA L. REV. 224, 243 (1961)).

There is no basis in this record upon which the district court could conclude that Holly had an opportunity to fabricate. *See* KENNETH S. BROUN, GEORGE E. DIX, ET AL., MCCORMICK ON EVIDENCE § 272 n.30 (5th ed. 2006) (collecting cases in which courts found no opportunity to fabricate). Simply noting thirty to forty minutes had elapsed between the accident and the time of her interview by Officer Capps was insufficient. Holly had just seen her mother seriously injured. She had attempted to lift the Windstar off her mother. She had to climb over her mother to put the Windstar in park. Immediately after dialing 911, she ran back to check on her mother–without even speaking to the 911 operator. After neighbors arrived, she ran to a friend's house where, thirty to forty minutes later, she spoke with Officer Capps. There is simply no reason to believe that she would have recovered from that experience in the short time between the accident and her statements to Officer Capps. There is also absolutely no evidence in the record that anyone counseled her about how she should describe the accident or even that she discussed the accident in any detail with anyone, including her father who, it appears, had yet to arrive at the neighbor's house. Additionally, the substance of her statements indicated that she thought that her mother was responsible for the accident. *See Gross v. Greer*, 773 F.2d 116, 120 (7th Cir. 1985) ("There is no reason to believe her statement to the officer was made with any premeditation, design or reflection."). It is highly improbable that, given the opportunity to fabricate or misrepresent, Holly would seize the

opportunity to concoct a statement that indicated that she thought that her mother was at fault as opposed to a statement attempting to protect her mother.

The district court also failed to fully analyze the third element. The third element asks whether the declarant made the statement under the stress of the excitement caused by the event. *Beverly*, 369 F.3d at 539-40. Relevant factors in determining whether a speaker remains under the stress of the excitement include "(1) the lapse of time between the event and the declarations; (2) the age of the declarant; (3) the physical and mental state of the declarant; (4) the characteristics of the event; and (5) the subject matter of the statements." *United States v. Jennings*, 496 F.3d 344, 349 (4th Cir. 2007) (quoting *Morgan v. Foretich*, 846 F.2d 941, 947 (4th Cir. 1988)); *see also Haggins*, 715 F.2d at 1058 (stating that factors such as age, physical condition, and mental condition affect the determination whether a declarant remains under the stress of the event); *United States v. Iron Shell*, 633 F.2d 77, 85-86 (8th Cir. 1980). Rather than considering these factors, the district court simply concluded that Holly "was calm." An examination of these factors, however, indicates that, whether or not the district court is correct to conclude from Officer Capps's description of Holly's demeanor that she "was calm," Holly appears to have clearly been under the influence of the stress of the excitement of the accident when she made her statement to Officer Capps.

A review of the record as a whole strongly indicates that Holly was still under the stress of the excitement of the accident. *See Tabaja*, 91 F. App'x at 410 (finding that the nature of the startling event justified applying excited utterance exception to a statement made up to eleven hours after the event). Holly witnessed her mother pulled underneath the Windstar and dragged down the driveway and across the street. According to her mother, Holly was screaming as the accident occurred. The accident left blood and skin on the driveway, and Holly heard her mother yelling as

-11-

Holly climbed over her to turn off the Windstar. The inference that Holly was affected by the accident is further supported by the fact that she did not even wait to speak to the 911 operator before running back to check on her mother. Additionally, Holly left the scene of the accident before learning whether her mother was safe. There is no suggestion that she had been comforted by her neighbors, told that her mother would be fine, told that her mother was not in any danger, or been comforted by her father who, it appears, had yet to arrive. In fact, Officer Capps concluded that Holly was still "naturally upset" when he spoke with her. The nature of the event itself therefore strongly supports a finding that Holly would have remained under the stress of the excitement of the event for a significant period of time.

The district court also does not appear to have considered Holly's age in assessing whether Holly was still under the stress of the excitement of the event. Holly was ten years old at the time of the statements and had just witnessed her own mother dragged down their driveway by the Windstar. Witnessing such an accident involving a parent would presumably affect a child regardless of age, but it seems to us indisputable that a ten-year-old child would be more profoundly affected than someone older and better equipped to deal with seeing a parent incapacitated and in great pain.[6] Accordingly, Holly's age also indicates that she was under the stress of the excitement of the event when she spoke to Officer Capps.

---

[6]The dissent suggests that Holly may not have fully grasped the severity of her mother's injury. Though Holly may not have known her mother's life was in danger, there simply can be no argument that she was unaware her mother was injured and in a great amount of pain. A ten-year-old child aware her mother had been hurt in such a serious accident would still be under the stress of the excitement of the accident a half-hour later regardless of whether she knew that her mother's life was in danger.

The remaining factors also indicate that Holly remained under the stress of the accident The subject matter of Holly's statements was the accident that injured her mother. When the subject matter of the statement involves the startling event itself, the subject matter supports a finding that the declarant was still under the stress of the accident. *See United States v. Alexander*, 331 F.3d 116, 123 (D.C. Cir. 2003) (quoted in *Arnold*, 486 F.3d at 186). Similarly, though some time elapsed between the accident and Holly's statements, it was clearly not enough time to take Holly outside the influence of the stress of witnessing the accident.

Finally, contrary to the district court's assessment of Holly's physical condition and state of mind, we find that Holly's physical condition and state of mind also indicate that she was under the stress of the excitement of the accident when she spoke with Officer Capps. While the district court concluded that Holly "was calm," it based its conclusion on a quote from Officer Capps's deposition taken out of context. In response to a question regarding Holly's demeanor, Officer Capps stated, "I don't recall her being very upset and having difficulty talking to me, I mean, other than naturally being upset about what had just happened. And I do recall thinking that she probably didn't really know at the time the seriousness of it." Nowhere in his deposition does Officer Capps describe Holly as "calm." In fact, Officer Capps clearly stated that Holly was "naturally upset about what happened."[7]

---

[7]The dissent argues that there was a reasonable basis in the record to support the district court's conclusion that Holly was calm. We disagree. Officer Capps's answer is not a model of clarity, but it unambiguously indicates that Holly was upset. While it is possible the district court relied on the beginning of Officer Capps's statement, "I don't recall her being very upset," that was not the entirety of his statement, much less the entirety of the record. Officer Capps noted Holly was naturally upset, and the natural level of distress at witnessing a parent seriously injured is unquestionably high. The district court thus clearly misconstrued the record in finding that Holly "was calm" at the time she spoke with Officer Capps.

Additionally, even if Holly had not manifested any outward indications of her state of mind, it is simply implausible that a ten-year old in this situation would be calm. When a child witnesses her parent suffer a serious injury and then displays no outward emotion, shock–not calm–would be the best assessment of her state of mind. And a statement made while in shock is an excited utterance. *See Haggins* 715 F.2d at 1058; *United States v. Sewell*, 90 F.3d 326, 327 (8th Cir. 1996) ("The justification for the 'excited utterance' exception . . . derives from the teaching of experience that the stress of nervous excitement or physical shock 'stills the reflective faculties.'") (quoting *United States v. Elem*, 845 F.2d 170, 174 (8th Cir. 1988)).

In conclusion, every possible factor in assessing the third element of the excited utterance exception to the hearsay rule about which the record provides information indicates that Holly was under the stress of the accident.[8] The district court either did not consider the relevant factors or did not apply them correctly to the case at hand. Its failure to correctly assess whether Holly remained under the stress of the excitement of the accident, paired with the clearly startling event and the lack of an opportunity for Holly to fabricate or misrepresent, gives us the firm conviction that the district court erred in its judgment that Holly's statements were not excited utterances. We are loath to

---

[8]The district court also referred to the fact that Holly's statements were made in response to questioning. Statements made in response to questioning are still excited utterances. *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999); *United States v. Glenn*, 473 F.2d 191, 194 (D.C. Cir.1972). Further, Officer Capps testified that Holly "came right out and told me everything. I didn't have to pry information out of her or anything." This strongly suggests that any questioning by Officer Capps did not affect the spontaneity of Holly's statements.

reverse the district court on this issue,[9] but we cannot escape our firm conviction that the district court erred.

We find that the record compels the conclusion that the accident was a startling event, that thirty to forty minutes did not provide a ten-year-old girl who had just watched her mother seriously injured the opportunity to contrive or misrepresent, and that Holly was still under the stress of the startling event when she made her statements to Officer Capps.

We further find that the district court's error was not harmless. "The harmless-error standard provides that if 'one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.'" *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409-410 (6th Cir. 2006) (quoting *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2002)). The district court's error in this case limited the jury to only one plausible version of the events leading to Dawn's injury. It is impossible to say how the jury would have acted if there had been an alternate explanation of the events leading to Dawn's injury rather than only the version put forward by Dawn and Holly at trial. *See Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 558-60 (6th Cir. 2004) (exclusion of evidence of alternate narrative was not harmless error); *see also Hilyer v. Howat Concrete Co., Inc.*, 578 F.2d 422, 424 (D.C. Cir. 1978).[10] Additionally, Holly's statements regarding the accident were made immediately after the

---

[9]If the district court had heard live testimony regarding Holly's condition at the time of her statement to Officer Capps, we would be even more hesitant to reverse the district court's decision. However, that was not the case here. The district court excluded Officer Capps's testimony through a pretrial motion in limine, and it relied solely on the record as developed through discovery.

[10]The dissent suggests that even if excluding Holly's statements was error, the exclusion may not have affected Ford's substantial rights. In particular, the dissent suggests that the impact of Holly's statements would have been lessened by Holly's age and inexperience as a driver. We cannot agree. First, the dissent overlooks the probative weight Holly's statements would have as the

-15-

accident and are the most contemporaneous account of the accident available. They are thus powerful evidence of what in fact happened. Accordingly, the exclusion was not harmless error.[11]

## III

The district court abused its discretion in excluding Holly's statements. Given the potential importance of an alternate explanation for the events leading to Dawn's injury, it cannot be said with fair assurance that the exclusion of Holly's statements did not affect the outcome of the trial. Thus, we **REVERSE** the district court's exclusion of Holly's statements as inadmissible hearsay and **REMAND** for the district court to grant a new trial.

---

most contemporaneous account of the accident. Second, the dissent engages in its own "highly debatable conjecture" by suggesting that arguments regarding the weight given to Holly's statements would have substantially diminished the effect of admitting Holly's statements. Based on the evidence at trial, the jury could find either that the gearshift slipped from "illusory park" into reverse after Dawn left the Windstar or that Dawn exited the Windstar while the Windstar was still in reverse. It is no surprise that, faced with this choice, the jury found the Maggards' theory more likely. Holly's statements, however, provide another explanation for the accident, which was that Dawn slipped upon entering the vehicle and pulled the gearshift from Park into Reverse. It is not conjectural to find that a jury may alter its judgment if provided another plausible account of the event at the center of the dispute. Certainly, we cannot say with fair assurance that the exclusion of Holly's statements did not affect the judgment.

[11]The error in excluding Holly's statements was further compounded by the district court's error in barring its admission even for impeachment purposes. The district court conceded in its order on Ford's motion for judgment as a matter of law that Officer Capps should have been allowed to testify to impeach Holly.

**LUDINGTON**, District Judge, dissenting. Respectfully, I write separately for three reasons. First, while decisions related to the law of evidence governing hearsay and its exceptions are to be reviewed applying the abuse of discretion standard, factual determinations made by the district court in applying that law are to be reviewed for clear error. The latter standard of review, in my view, is implicated here and I would find no error. Second, even if the district court erred in excluding Holly's out-of-court rendition of the events, Ford's substantial rights were not affected by the district court's exclusion of the statement from evidence. Finally, I would reverse the district court's determination that adequate evidence was presented to justify the jury's conclusion that Ford was "reckless" and that the Maggards were entitled to an award of punitive damages.

I

Extrajudicial statements carry a presumption of unreliability, *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994), because the declarant's statements are not given under oath in the presence of the fact finder or subject to cross-examination. 2 MCCORMICK ON EVIDENCE § 245 (Kenneth S. Broun ed., 2006) (citing *California v. Green*, 399 U.S. 149, 154 (1970). Testimony subject to these conditions enables the finder of fact to evaluate a witness's perception, memory, narration, and sincerity to expose any inaccuracies. FED. R. EVID. Art. VIII, advisory committee's note (introductory note). The exceptions to the hearsay rule, developed through the common law, "proceed[] upon the theory that under appropriate circumstances a hearsay statement may possess circumstantial guarantees of trustworthiness sufficient to justify nonproduction of the declarant in person at the trial even though he may be available." FED. R. EVID. 803, advisory committee's note. There is no disagreement that for a statement to be admitted under the excited-utterance exception to the hearsay rule that: "1) there be an event startling enough to cause nervous excitement; 2) the

-17-

statement be made before there is an opportunity to contrive or misrepresent; and 3) the statement be made while the person in under the stress of the excitement caused by the event." *United States v. Beverly*, 369 F.3d 516, 539-40 (6th Cir. 2004).

Decisions about the facts of the case must, however, be made by the district court in order to apply the rules of evidence generally and, in this instance, to determine the applicability of the excited utterance exception to the hearsay rule. FED. R. EVID. 104(a) directs that district courts are to resolve "preliminary questions concerning . . . the admissibility of evidence." In contrast to most determinations about consequential facts, the court, rather than the jury, resolves preliminary issues of fact for the simple reason that it is necessary to insulate the jury from inadmissible evidence. 21A CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5052.1 (2d ed. 2005); *see also* 1 JACK B. WEINSTEIN AND MARGARET A. BERGER, FEDERAL EVIDENCE § 104.14(3) (Joseph M. McLaughlin, ed., 2d ed. 1997). A court's factual findings pursuant to Rule 104(a) "must be established by a preponderance of proof." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 n.10 (1993) (citing *Bourjaily v. United States*, 483 U.S. 171, 175-176 (1987)); *see also United States v. Conrad*, 507 F.3d 424, 429 (6th Cir. 2007). The Sixth Circuit reviews findings made under Rule 104(a) for clear error. *Conrad*, 507 F.3d at 429.

Turning to Holly's statement in this case, the district court observed that the statement was made at the neighbor's house at least thirty minutes after the accident and that Holly was "not still in the emotional state in which she undoubtedly was at the time of the accident itself." (J.A. at 212-13). Certainly, the location and circumstances of Holly's statement, while not determinative, support the district court's decision that Holly was removed from the emotional impact of the accident. Lapses of time between the startling event and the statement are to be analyzed in context. The Sixth

Circuit, for example, has concluded that a "nervous" statement made seven minutes after a police search and arrest not to be within the excited-utterance exception because the arrest would not create a period of excitement for that period. *United States v. McGhee*, 161 F. App'x 441, 445 (6th Cir. 2005) (unreported).

The district court may have taken Officer Capps's statement out of context and Holly may, in fact, have remained under the sway of the startling event. Indeed, Officer Capps indicated that Holly was "naturally . . . upset about what had just happened." (J.A. at 328). However, as the district court observed, Officer Capps also testified that he did not "recall her being very upset" and that "she probably didn't really know at the time the seriousness of [the accident]." *Id.* Thus, Officer Capps's testimony reasonably supported the district court's conclusion that Holly was sufficiently removed from the emotional events of her mother's accident.

It is also true that the events of the accident were serious – e.g., Holly witnessed her mother being dragged by the vehicle, and Holly assisted her mother after the accident. However, Holly's statement was made according to her memory some thirty to forty minutes after the accident and after she walked a distance to a neighbor's house where she remained for the night.

Holly's age can also cut in more than a single way when examining the factors relevant to the excited utterance exception to the hearsay rule. While a young witness might be less likely to fabricate or shade facts, it is equally plausible that Holly's youthful age kept her from grasping the life-altering implications of her mother's injuries. In contrast to an adult, a ten-year-old child may not appreciate the gravity of such a horrific accident. Indeed, Officer Capps observed while taking Holly's statement that she did not appear to appreciate the "seriousness" of the accident. Again,

-19-

while the evidence available to the district court could be interpreted more than one way, the district court's factual conclusions were grounded in the record.

One concluding point should be made here. The district court decided that Holly's statement should be excluded from evidence at trial in response to a motion in limine based upon the parties' competing views of the discovery. The district court did not reach its decision based upon its impression of Holly's or Officer Capps's in-court testimony, but upon its evaluation of the deposition transcripts. However, the parties did not seek a hearing, nor did Ford contend that failing to grant a hearing was error. *See* FED. R. EVID. 104(c). More importantly, FED. R. EVID. 104(a) allocates the authority to resolve questions of preliminary fact to the district court in order to implement the rules of evidence and not because the trial judge is a superior finder of fact than a jury. Indeed, that principle would seem to be emphasized by the fact that in reaching decisions related to preliminary questions, with the exception of the rules related to privilege, the district court is "not bound by the rules of evidence." FED. R. EVID. 104(a) & 1101(d).

II

Even if the district court committed clear error in excluding Holly's statement, there is no reason to believe that admission of Holly's rendition of the events would have been material to the jury. FED. R. EVID. 103(a) provides that an erroneous exclusion of otherwise admissible evidence is inconsequential unless "a substantial right of the party is affected." An evidentiary error justifies the nullification of "a jury verdict where the error so altered the total mix of information submitted to the jury that it was substantially likely to have affected the verdict." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 804 (6th Cir. 2007); *see also Rush v. Ill. Cent. R.R. Co.*, 399 F.3d 705, 723-24 (6th Cir. 2005).

While a child witness is presumed competent, trial courts are to remain alert to verify a child witness's ability to understand the significance of the oath and that the child maintains the capabilities of observation, recollection, and narration. FED. R. EVID. 601. Holly, as any witness with no driving experience, would likely be unfamiliar with the mechanics of a vehicle's transmission, the ignition-key interlock, or brake-shift interlock, and would be less likely to perceive the events in the same way as a witness with such experience. In my view, the suggestion that exclusion of Holly's testimony affected the substantial rights of Ford remains highly debatable conjecture.

More importantly, Ford's expert witness, Frederick W. King, III, acknowledged the possibility that Dawn could have shifted the transmission out of park when entering the vehicle, but only if the ignition had been turned off. He explained that the brake-shift interlock would have prevented Dawn from accidentally shifting the gearshift if the engine was running. However, there was no evidence that Dawn turned the engine off and no evidence that the vehicle rolled solely in response to the grade of the driveway. Indeed, the district court excluded King's opinion from being presented to the jury because the record did not support the proposition that the vehicle's engine was off at the time of the accident. Ford proceeded to trial with its expert explaining to the jury that the Windstar's engine was operating and that the cause of the accident was Dawn's failure to place the transmission in park. Mauldin rejected Holly's statement to Officer Capps as "not consistent with the operational characteristics of a 1999 Ford Windstar van." (J.A. at 89). While a party may offer competing explanations for an event, it is difficult to conclude that Ford's "substantial rights" were affected by the omission of Holly's testimony.

III

-21-

The award of punitive damages should, in my judgment, be reversed. The Maggards did not advance evidence demonstrating fraudulent, malicious, oppressive, consciously indifferent, or reckless conduct. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 900 (Tenn. 1992). "A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Id.* (citing Tenn. Code Ann. § 39-11-302(c)). Under this standard, punitive damages are only available for the "most egregious wrongs." *Id.* at 901. "The tort must be intentional or fraudulent or a species of recklessness that contains an element of conscious wrongdoing. Under Tennessee law, the plaintiff must show by clear and convincing evidence that the defendant is aware of, but consciously disregards, a substantial and unjustifiable risk in a reckless way." *Capello v. Duncan Aircraft Sales of Fl., Inc.*, 79 F.3d 1465, 1474 (6th Cir. 1996).

The Maggards did not meet the clear and convincing standard by demonstrating that Ford's conduct was reckless for many reasons. Neil Mizen, the Maggard's expert witness, testified that the vehicle was "unreasonably dangerous" because Ford did not incorporate a warning system that would have sounded the vehicle's horn. (J.A. at 264, 270). Mizen offered his opinion that the warning system would have prevented the accident, but he had not designed or tested his suggested warning system. (J.A. at 279).

In contrast, the record demonstrated that no other automobile manufacturer utilized the Maggards' expert's proposed warning system in 1999. Ford's technology was consistent with the most advanced practice observed by vehicle manufacturers. The Maggards' expert witness acknowledged both of these facts and provided the following testimony:

Q:      And all these vehicles except the one Toyota that you mentioned earlier could be placed in between Reverse and Park in what you call Illusory Park, and therefore all of those vehicles are defective and unreasonably dangerous in that regard. Isn't that right?

A. To that extent, yes.

Q:      That would mean there are millions and millions of vehicles on the road today which are, in your opinion, defective and unreasonably dangerous with respect to the ability to place the transmission's controls between Reverse and Park, correct?

A:      Yes, it does.

(J.A. at 278). In order to find the Maggards' expert's opinion reasonable, one must accept the proposition that virtually every automobile manufacturer in the world was "reckless" in the design of their transmission.

Second, rather than installing a warning system, Ford demonstrated that it focused on improving the steering column and related transmission – a strategy that King testified that Ford believed was more effective in protecting Ford's customers. King's conclusion was grounded in Ford's prior experience with customer reaction to a similar warning system for seatbelts. While the district court noted King's potential bias, the Maggards only offered their expert's opinion to the contrary – which was not supported by testing to evaluate its effectiveness.

In addition, Ford's decision to improve the transmission selection mechanism rather than to install a warning system was consistent with the standards promulgated by National Highway Traffic Safety Administration and the Society of Automotive Engineers, and was otherwise consistent with federal regulations.

Finally, the record is devoid of any evidence that Ford chose not to install the warning system for purely financial reasons. While King agreed during cross-examination that a warning system might be constructed for an estimated expense of three dollars per vehicle, the Maggards did not offer any evidence that Ford based its decision on the expense of the proposed device rather than effective protection of the customer. King testified that improvements were made instead to the steering column. The Maggards' expert also acknowledged that the improvements to the steering column and gear shift lever were "good design[s]" intended to minimize occurrences of illusory park. (J.A. at 274-75, 288).

The evidence, in summary, did not demonstrate by clear and convincing evidence that Ford's conduct was reckless under Tennessee law and it did not warrant the award of punitive damages.

IV

For these reasons, I respectfully dissent and would affirm the district court's exclusion of Holly's statement, while reversing the award of punitive damages.